```
                                              ┌──────────────────────────────┐
                                              │ USDC SDNY                    │
                                              │ DOCUMENT                     │
UNITED STATES DISTRICT COURT                  │ ELECTRONICALLY FILED         │
SOUTHERN DISTRICT OF NEW YORK                 │ DOC #: _____        │
                                              │ DATE FILED: NOV 1 0 2014     │
----------------------------------------X     └──────────────────────────────┘
  IN RE TRONOX INCORPORATED          :

  TRONOX INCORPORATED, et al.,       :

                  Plaintiffs,        :

          -v-                        :        14-cv-5495 (KBF)

  ANADARKO PETROLEUM                 :        OPINION & ORDER
  CORPORATION, et al.,               :

                  Defendants.        :
----------------------------------------X
```

KATHERINE B. FORREST, District Judge:

In this case,[1] the Court is asked to approve a settlement agreement resolving

two lawsuits in which Tronox, Incorporated[2] ("Tronox") and the Government[3]

asserted fraudulent transfer and other claims against Kerr-McGee Corporation

("Kerr-McGee") and its parent company, Anadarko Petroleum Corporation

("Anadarko").[4]  Tronox, which is in chapter 11 bankruptcy before the United States

---

[1] References to entries on the docket of the main bankruptcy case (no. 09-10156) will be formatted "Bankr. Dkt. No. ___," references to entries on the docket of the adversary proceeding (no. 09-1198) will be formatted "Adv. Dkt. No. ___," and references to entries on the docket of the proceedings before this court (no. 14-cv-5495) will be formatted "ECF No. ___."

[2] Tronox Incorporated was joined by Tronox LLC, Tronox Worldwide LLC, and several affiliates. (Adv. Dkt. No. 1.)

[3] The United States is acting on behalf of the U.S. Environmental Protection Agency ("EPA"); the U.S. Department of Agriculture, acting through the U.S. Forest Service; the U.S. Department of Commerce, acting through the National Oceanic and Atmospheric Administration; the U.S. Department of the Interior, acting through the Fish and Wildlife Service and the Bureau of Land Management; the U.S. Department of Defense, including the U.S. Department of the Army, U.S. Army Corps of Engineers, U.S. Department of the Navy, and U.S. Department of the Air Force; and the Nuclear Regulatory Commission. (ECF No. 1 ex. A at 1.)

[4] Also named as defendants are Anadarko US Offshore Corporation (f/k/a Kerr-McGee Oil & Gas Corporation), Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-McGee Credit LLC, Kerr-McGee Shared Services Company LLC, and Kerr-McGee Stored Power Company LLC. (Adv. Dkt. No. 223.)

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), initially filed this lawsuit on behalf of creditors who hold environmental and tort claims against it. The Government subsequently intervened on behalf of Tronox. The case was litigated before the Bankruptcy Court, which recommends that this Court approve the settlement agreement. (See Findings of Fact and Conclusions of Law on Joint Motion for a Report and Recommendation to the District Court Recommending Approval of Settlement Agreement Resolving the Adversary Proceeding and Issuance of an Injunction in Support Thereof at 5, ECF No. 1 ("R&R").)

The settlement is historic, providing $4.4 billion for the removal of pollution and environmental contaminants, the largest such recovery in American history. The settlement amount is also over $4 billion greater than what plaintiffs might recover if they pursued the damages phase of this litigation to its conclusion. Perhaps unsurprisingly, the settlement agreement enjoys overwhelming support among Tronox's many creditors.

Nevertheless, two tort claimants have objected to the settlement agreement as inadequate and unfair. Both hail from Columbus, Mississippi, where for three decades Kerr-McGee operated a wood treatment plant that discharged creosote, a toxic and carcinogenic substance. The objectors argue the settlement amount is too low, or that they are entitled to a greater share of the settlement proceeds. The Court is sympathetic to the objectors, whose community is coping with the toxic legacy Kerr-McGee has left in its wake. Nevertheless, the Court must consider the

broad interests of all of the parties affected by this litigation, not simply the narrow interests of the objectors.

After reviewing de novo the Bankruptcy Court's proposed findings of fact and conclusions of law and the matters to which parties have timely and specifically objected, the Court OVERRULES the objections, ADOPTS the Bankruptcy Court's findings of fact and conclusions of law, and APPROVES the settlement agreement. The Court also ISSUES the requested permanent injunction.

I.    PROCEDURAL HISTORY

In 2006, Kerr-McGee completed a series of transactions that resulted in the spin-off of Tronox, which Kerr-McGee left saddled with the massive environmental and tort liabilities it had accumulated over the course of decades of operating in the chemical, mining, and oil and gas industries, but without sufficient assets with which to address these liabilities. (See Adv. Dkt. No. 622 at 19-26.) Tronox voluntarily filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York on January 12, 2009. (Bankr. Dkt. No. 1.) Subsequently, the United States and numerous state, local, and tribal governments filed proofs of claim against Tronox on account of alleged environmental liabilities, and many private individuals submitted proofs of claim on account of alleged tort liabilities. (R&R at 5-6.) These claims will be resolved pursuant to a reorganization plan that has been confirmed by the Bankruptcy Court (the "Plan"). (See Bankr. Dkt. No. 2567.)

3

On May 12, 2009, Tronox filed a lawsuit (the "Adversary Proceeding") for the benefit of its environmental and tort claimants against Kerr-McGee and Anadarko,[5] alleging that the transactions that resulted in Tronox's spinoff from Kerr-McGee amounted to an actual and constructive fraudulent conveyance. (See Adv. Dkt. No. 1.) Under the Plan and several related agreements, Tronox's environmental claimants will receive approximately 88% of the net proceeds from the lawsuit, and its tort claimants will receive approximately 12%. (See Bankr. Dkt. Nos. 2692 at 2, 11-12 & ex. 1 ¶¶ 119-23; 2747; 2567 ¶¶ 35-38 & ex. A art. III §§ B.4.(b), 5.(b)(i); see also R&R at 7-8.) On May 21, 2009, the Government filed a complaint-in-intervention (the "U.S. Joinder") asserting claims under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3301 et seq. (Adv. Dkt. No. 5.) On February 14, 2011, the Bankruptcy Court appointed a litigation trust (the "Litigation Trust") to represent Tronox, and substituted it for Tronox as the party in this litigation. (Bankr. Dkt. No. 2812.) The Litigation Trust and the Government litigated the Adversary Proceeding jointly. (See R&R at 6.)

After a 34-day trial, the Bankruptcy Court issued a 166-page opinion finding Kerr-McGee and Anadarko liable for actual and constructive fraudulent transfers. (Adv. Dkt. No. 622.) But the Bankruptcy Court declined to award damages, instead provisionally finding defendants liable either for approximately $5.15 billion or for

---

[5] On May 8, 2012, the Bankruptcy Court dismissed Anadarko Petroleum Corporation from the case; a final order has not yet been entered effecting that dismissal. (R&R at 3 n.5.)

approximately $14.17 billion, depending on the resolution of a legal question on which the Bankruptcy Court ordered further briefing. (Id. at 149).

In their briefs, the parties argued that the actual amount of damages should be higher or lower than the Court's initial estimates by billions of dollars. Defendants argued that they were not liable for any damages, and that if they were, their liability was limited to approximately $850 million. (Adv. Dkt. No. 623 at 20.) By comparison, the Litigation Trust and the Government argued that damages were in excess of $20 billion. (Adv. Dkt. No. 624 at 1, 26.)

Before the Bankruptcy Court could award damages, the parties agreed to settle.[6] In essence, the settlement agreement, as corrected on April 9, 2014 (the "Settlement Agreement") (Adv. Dkt. No. 637), provides that Anadarko will pay the Litigation Trust $5.15 billion in exchange for releases, and that the United States and Anadarko will not sue each other or assert claims relating to the sites with which the environmental and tort claims are concerned (see id.; R&R at 9-12). The settlement represents the largest-ever environmental cleanup recovery in the Government's history. (United States of America's Response to Objections to Proposed Findings of Fact and Conclusions of Law at 2-3, ECF No. 7 ("U.S. Response").)

On April 9, 2014, the parties filed a motion (the "Recommendation Motion") seeking a report and recommendation from the Bankruptcy Court advising this

---

[6] The key provisions of the Settlement Agreement are included in the Bankruptcy Court's report and recommendation. (See R&R at 8-12.)

5

Court to enter a final order approving the Settlement Agreement, and to permanently enjoin certain parties from asserting certain related claims (the "Injunction"). (Adv. Dkt. No. 638.)

    On April 12, 2014, the claims and noticing agent in the chapter 11 cases completed timely service of more than 66,000 copies of the Recommendation Motion and the Settlement Agreement to potentially interested parties, as required by Bankruptcy Rule 2002(a)(3). (Adv. Dkt. Nos. 640, 653.) The settling parties also published notices in 86 newspapers across the country over the course of 14 days, and created an informative website that received hundreds of unique visits. (Adv. Dkt. Nos. 651, 653.) Five objections to the Recommendation Motion were then filed on the docket, of which three were from tort claimants from Columbus, Mississippi, where from 1964 to 2003 Kerr-McGee Chemical LLC owned and operated a wood-treatment plant that discharged the toxic and carcinogenic chemical creosote. (Adv. Dkt. Nos. 643-48, 650; Bankr. Dkt. Nos. 2991-95.)

    On April 14, 2014, the Government published notice of the Settlement Agreement in the Federal Register, commencing a period of public comment that ran through May 14, 2014. 79 Fed. Reg. 20,910, 20,910-11 (Apr. 14, 2014). Residents of Columbus, Mississippi requested additional time to submit public comments, and the Government extended the deadline to May 21, 2014. 79 Fed. Reg. 27,638, 27,638-39 (May 14, 2014). Ultimately, the Government received 338 timely comments and 94 untimely comments, nearly all of which were form letters provided by individuals interested in the Columbus, Mississippi site. (R&R at 16;

6

Government's Letter to Bankruptcy Judge Gropper, ECF No. 5 ("Gov't's Letter").)
At the request of members of the local community in Columbus, the Government
held a public meeting there on May 5, 2014. (Adv. Dkt. 657 ex. A.) After
considering the written comments it received and the transcript of the public
meeting, the Government decided to support the Settlement Agreement. (Adv. Dkt.
Nos. 656-57.)

The Bankruptcy Court held a hearing on the Recommendation Motion on
May 28, 2014, and two days later it issued a Report and Recommendation advising
this Court to approve the Settlement Agreement and to issue the Injunction. (Adv.
Dkt. Nos. 658, 661.) The Bankruptcy Court provided the parties with 35 days to file
objections to the Report and Recommendation—the maximum amount of time
permitted under the Bankruptcy Rules, see Fed. R. Bankr. P. 9033—plus 3 days for
mailing. (Adv. Dkt. No. 661.) By the end of this 38-day period, only two parties had
filed objections: Maranatha Faith Center, Inc. ("Maranatha") and Anita Gregory,
both from Columbus, Mississippi. (Objection to Proposed Findings of Facts and
Conclusions of Law  and Entry of Judgment, ECF No. 3 ("Maranatha Objection");
Objection of Anita Gregory, ECF No. 4 ("Gregory Objection").) Anadarko and the
Government filed responses to these objections. (See ECF Nos. 6-7.)

## II.    JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over Tronox's claims under 28 U.S.C. § 1334 because they are related to Tronox's chapter 11 bankruptcy proceeding, which was properly referred to the Bankruptcy Court under 28 U.S.C. § 157(a).[7] The Court has supplemental jurisdiction over the U.S. Joinder under 28 U.S.C. § 1367.

This Court reviews the Bankruptcy Court's findings of fact and conclusions of law <u>de novo</u>. Under 28 U.S.C. § 157(b), there are two kinds of bankruptcy proceedings: "core" proceedings and "non-core" proceedings. Under Article III of the Constitution, a bankruptcy court has authority to issue final orders and judgments only in certain core proceedings. See <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2611 (2011).[8] In both core and non-core proceedings, a bankruptcy court may, instead of issuing a final order or judgment, submit proposed findings of fact and conclusions of law to a district court. 28 U.S.C. § 157(c)(1) (in non-core proceeding "otherwise related to a case under title 11 . . . the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court"); <u>Exec. Benefits Ins. Agency v. Arkison</u>, 134 S. Ct. 2165, 2173 (2014) (in a core proceeding in which a district court does not have authority to issue a final order or judgment, it may issue proposed findings of fact and conclusions of law to the district court); <u>In re Orion Pictures Corp.</u>, 4 F.3d 1095, 1100-01 (2d Cir. 1993) (in a non-core proceeding,

---

[7] The Southern District of New York has a standing order in place that provides for the automatic referral of bankruptcy cases to the Bankruptcy Court. <u>Amended Standing Order of Reference</u> (S.D.N.Y. Jan. 31, 2012) (most recent order).

[8] In <u>Stern v. Marshall</u>, the Supreme Court held that in certain core proceedings, bankruptcy courts lack authority under Article III of the Constitution to enter final orders and judgments. 131 S. Ct. at 2611.

8

"the bankruptcy court is only empowered to submit proposed findings of fact and conclusions of law to the district court for de novo review"); <u>Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC</u>, 490 B.R. 46, 55-56 (S.D.N.Y. 2013) (in cases in which Congress attempted to grant bankruptcy courts the power to issue final orders and judgments, bankruptcy courts necessarily also have authority to issue proposed findings of fact and conclusions of law); <u>Kirschner v. Agoglia</u>, 476 B.R. 75, 82 (S.D.N.Y. 2012) (same). The district court may then enter a final order or judgment after "considering the bankruptcy judge's proposed findings and conclusions" and "reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1). The district court "may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Fed. R. Bankr. P. 9033(d).[9]

---

[9] The settling parties argue that the settlement-approval proceeding should be treated as a non-core proceeding. (ECF No. 26.) This Court need not decide whether the settlement-approval proceeding was core or non-core because the standard of review employed by this Court would be the same regardless. Of course, by their plain text, 28 U.S.C. § 157(c)(1) and Rule 9033(d) of the Federal Rules of Bankruptcy Procedure only provide the standard of review for proposed findings of fact and conclusions of law in non-core proceedings, and no rule or statutory provision sets forth the standard of review for proposed findings of fact and conclusions of law in core proceedings. However, the most logical explanation for the absence of specific legislative guidance as to district court review of proposed findings of fact and conclusions of law in core proceedings is that § 157(c)(1) and Rule 9033(d) embody the standards of review Congress intended for district courts to employ <u>whenever</u> they are tasked with reviewing a bankruptcy court's proposed findings of fact and conclusions of law.

III.    THE BANKRUPTCY COURT'S FINDINGS OF FACT

In her objection, Gregory makes a number of factual assertions in support of
her arguments for rejecting the Settlement Agreement.  In particular, Gregory
details at length her understanding of the effects of environmental contamination
on the health of members of the Columbus, Mississippi community, as well as her
belief that defendants knew the activities of their chemical industry operations
could cause such effects.  (See Gregory Objection at 2-5, 7-9, 11).  Gregory also
disputes one of plaintiffs' experts' estimates of environmental cleanup costs (see id.
at 3-4), and she suggests that the Bankruptcy Court's findings of fact were based on
fraudulent documents, though she does not provide any evidence to support this
claim (see id. at 12).

The Bankruptcy Court's conclusions of fact, however, relate only to the
procedural history of this action and the Settlement Agreement itself.  (See R&R at
5-19).  Gregory's factual objections and the Bankruptcy Court's conclusions of fact
are therefore like ships passing in the night, as Gregory's factual objections do not
concern the specific findings of fact in the Bankruptcy Court's report and
recommendation, with the exception of her baseless claim that the Bankruptcy
Court relied on fraudulent documents.  Accordingly, the Court ADOPTS the
Bankruptcy Court's findings of fact in their entirety.

IV.    THE BANKRUPTCY COURT'S CONCLUSIONS OF LAW

A. General Approval of Settlement Agreement and Specific Objections

The Court may only approve a settlement agreement if it is "fair and
equitable."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

10

Anderson, 390 U.S. 414, 424 (1968).  To determine whether a settlement agreement
is fair and equitable, the Court considers the following interrelated factors:

1. "the balance between the litigation's possibility of success and the
   settlement's future benefits";

2. "the likelihood of complex and protracted litigation, with its attendant
   expense, inconvenience, and delay, including the difficulty in collecting on
   the judgment";

3. "the paramount interests of the creditors, including each affected class's
   relative benefits and the degree to which creditors either do not object to
   or affirmatively support the proposed settlement";

4. "whether other parties in interest support the settlement";

5. "the competency and experience of counsel supporting, and the experience
   and knowledge of the bankruptcy court judge reviewing, the settlement";

6. "the nature and breadth of releases to be obtained by officers and
   directors";

7. "the extent to which the settlement is the product of arm's length
   bargaining."

In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotation
marks omitted).  Here, each of these factors counsels in favor of approving the
Settlement Agreement:

1. If the parties pursued the damages phase of the litigation to its
   conclusion, plaintiffs may only receive approximately $850 million in

11

damages, whereas the Settlement Agreement provides for $5.15 billion dollars. In addition, approving the Settlement Agreement would enable plaintiffs to obtain their damages award much more quickly than may occur if additional litigation is required.

2. Given the wide disparity in plaintiffs' and defendants' estimates of the appropriate damages award, which range from approximately $850 million to approximately $20 billion, resolving the damages phase of this litigation would likely be quite time-consuming and costly for the parties. Further, delay is a significant concern here, as every day that goes by before its resolution is another day that ailing tort claimants sit waiting for the funds needed to address their health problems, and that unremediated environmental sites continue to pose a risk to those who live or work near or on them.

3. The Settlement Agreement enjoys overwhelming support among Tronox's creditors. Although the settlement concerns over 1,880 contaminated sites all across the country (see 79 Fed. Reg. 20,910, 20,911 (Apr. 14, 2014)), only two parties have filed objections to it.

4. No parties in interest other than Maranatha and Gregory have objected to the Settlement Agreement.

5. All of the parties to the Settlement Agreement are represented by experienced counsel from prominent law firms or the Department of Justice. Further, the bankruptcy judge practiced as a bankruptcy

12

attorney for decades, and he has an excellent reputation for both fairness and legal ability.  See 1 Almanac of the Federal Judiciary, 2014 WL 3753675 (2014 ed.) (profile of Judge Allan L. Gropper).

6. The Settlement Agreement's releases of officers and directors are no broader than any other releases contained in the agreement.

7. There is no evidence that any of the parties to the Adversary Proceeding coerced any of the other parties into accepting the Settlement Agreement.

Thus, a full consideration of the In re Iridium factors suggests that this Court should accept the Bankruptcy Court's conclusion that the Settlement Agreement is fair and equitable and meets the standards for approval under applicable law. (R&R at 24.)  But before reaching a final conclusion on this issue, the Court must consider the specific objections set forth by Maranatha and Gregory.[10]

First, both Maranatha and Gregory object that the settlement amount is too low.  Specifically, Maranatha objects to the Settlement Agreement on the grounds that Anadarko's cash position and cash flow enable it to pay significantly more than

---

[10] In its objection, Maranatha seeks to incorporate by reference all of the arguments from its objection at the hearing on May 28, 2014. (Maranatha Objection ¶ 5.)  However, Rule 9033(d) of the Federal Rules of Bankruptcy Procedure provides that this Court must only review "specific written objection[s]" to the Bankruptcy Court's findings of fact or conclusions of law. Fed. R. Bankr. P. 9033(d) (emphasis added).  Further, Rule 9033(d) is modeled on Federal Rule of Civil Procedure 72(b), under which such incorporation by reference is not permitted because ""[i]t is improper for an objecting party to attempt to relitigate the entire content of the hearing before the Magistrate Judge by submitting papers to a district court which are nothing more than a rehashing of the same arguments and positions . . . ." Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan, 806 F. Supp. 380, 381-82 (W.D.N.Y. 1992); accord Russell v. Astrue, No. CIV–09–617–D, 2010 WL 3292821, at * 1 n.1 (W.D. Okla. Aug. 19, 2010); Edwards v. Niagara Credit Solutions, Inc., 586 F. Supp. 2d 1346, 1348 (N.D. Ga. 2008) (Martin, J.); Jackson v. Rohm & Haas Co., No. 05-4988, 2008 WL 123921, at *2 n.1 (E.D. Pa. Jan. 10, 2008).  For this reason, the Court consider will not consider the arguments Maranatha seeks to incorporate by reference except to the extent that they are specifically set forth in its objection.

the amount it has agreed to pay under the Settlement Agreement. (See Maranatha Objection at 1-3 & ex. 1.)[11] Along these lines, both Maranatha and Gregory object to the Settlement Agreement because Anadarko and its affiliates have allegedly benefited from it financially, either through the effects of the announcement of the settlement on Anadarko's stock price (Maranatha Objection at 2) or its effects on Anadarko's tax liabilities (Gregory Objection at 5).

These arguments misunderstand the standard for approving a settlement, as well as the "policy of the law generally to encourage settlements." West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085 (2d Cir. 1971). The law does not require a defendant to completely empty its pockets before a settlement may be approved—indeed, if it did, it is hard to imagine why a defendant would ever settle a case. Rather, the law merely requires a settlement to be "fair and equitable," In re Iridium, 478 F.3d at 462, which is to say, not overly one-sided. Because the settlement amount falls well within the range of reasonable possibilities, Anadarko's ability to pay more than it has agreed to is simply immaterial to whether this court should approve the Settlement Agreement. Accordingly, the Court rejects these objections.

Gregory also objects to the Settlement Agreement because she believes the Columbus, Mississippi creosote claimants are entitled to a greater share of the

---

[11] Maranatha also objects that the Bankruptcy Court failed to take into account a potential award of punitive damages when it assessed the reasonableness of the settlement amount. (See Maranatha Objection at 3.) However, punitive damages cannot be awarded in this action. See In re Tronox, 429 B.R. 73, 110-12 (Bankr. S.D.N.Y. 2010) (plaintiffs not entitled to punitive damages under the Bankruptcy Code or Oklahoma law).

14

proceeds, and she requests that the Court award them an additional \$1.5 billion.[12]
(Gregory Objection at 2.)  However, this Court cannot now change how the net
proceeds of this litigation will be allocated, because these allocations were
confirmed by the Bankruptcy Court in the Plan and thus became final and non-
appealable years ago. (See Bankr. Dkt. 2567 at ¶¶ 36-37, 85, 92-95; Bankr. Dkt.
2747 ex. A ¶ 1.)  Accordingly, the Court rejects this objection because it is barred
under the doctrine of res judicata.  See Sure-Snap Corp. v. State St. Bank & Trust
Co., 948 F.2d 869, 873 (2d Cir. 1991) (order confirming Chapter 11 plan has res
judicata effect).

    The Court also rejects Maranatha's and Gregory's remaining objections to the
Settlement Agreement.  First, the Court rejects Maranatha's argument that the
Settlement Agreement should be approved because it violates the "clear heads
doctrine" (Maranatha Objection at 3) because no such doctrine is recognized in the
Second Circuit.  Second, the Court rejects Gregory's objection to the Settlement
Agreement on the basis of the proposed environmental remediation method for the
Columbus, Mississippi site (see Gregory Objection at 10-11) because the Settlement
Agreement does not address remediation methods.  Third, the quality of the legal
representation provided by the attorney for the Columbus, Mississippi creosote
claimants (see Gregory Objection at 6-7, 12-15) is not a valid basis for declining to

---

[12] Gregory also requests that the Court appoint a lawyer and an accountant for the Columbus,
Mississippi creosote claimants, apparently for the purposes of obtaining and administering the \$1.5
billion she believes should be awarded to them.  (See Gregory Objection at 2.)  Litigants do not have
a right to counsel in this kind of proceeding, see Turner v. Rogers, 131 S. Ct. 2507, 2516-17 (2011)
(party has right to counsel in civil matters only if they face a threat of imprisonment or loss of
physical liberty), nor do they have a right to the appointment of an accountant.

approve the Settlement Agreement. Lastly, the Court rejects Gregory's request that the Court not approve the Settlement Agreement before the Columbus, Mississippi creosote claimants have had the opportunity to meet with Congress. (See Gregory Objection at 1.) This argument misunderstands our Constitution's separation of powers—the Court's decision is based on its review of the facts and the law. The views of members of Congress as to the merits of this litigation are not a proper basis upon which this Court can rest a decision.

## B. Approval of Settlement Agreement Relating to Liabilities under Federal Environmental Law

A settlement agreement relating to liabilities under federal environmental law may be approved where it is fair, reasonable, and consistent with federal environmental law. In re Cuyahoga Equip. Corp., 980 F.2d 110, 118-20 (2d Cir. 1992). In assessing an environmental settlement agreement to which an agency of the federal government is a party, courts "ordinarily defer to the agency's expertise and the voluntary agreement of the parties in proposing the settlement." Id. at 118 (citing Chevron, U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-44 (1984); United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990)).

The Bankruptcy Court concluded that the Settlement Agreement met this standard (R&R at 27-28), and no party has specifically contested this conclusion. The Court agrees with the Bankruptcy Court's conclusion. The Settlement Agreement promotes federal environmental law's objectives of "encourag[ing] prompt and effective responses to hazardous waste releases," "impos[ing] liability on responsible parties," and "reduc[ing] the inefficient expenditure of public funds

16

on lengthy litigation." In re Cuyahoga, 980 F.2d at 119 (discussing the objectives underlying the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.).

    C. Approval of Government Enforcement Consent Decree

    "A consent decree 'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." Frew v. Hawkins, 540 U.S. 431, 437 (2004) (quoting Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 378 (1992)). A settlement agreement may function as a consent decree even if it is not labeled a "consent decree" and even if it does not impose injunctive obligations on the parties it binds. See, e.g., SEC v. Citigroup Global Mkts., Inc., 752 F.3d 285, 294 (2d Cir. 2014) (consent decree may or may not provide for injunctive relief); Doe v. Pataki, 481 F.3d 69, 70 (2d Cir. 2007) (a "court-approved stipulation of settlement between private and governmental parties" may be "equivalent to a consent decree"); see also VanDesande v. United States, 673 F.3d 1342, 1348 (Fed. Cir. 2012) ("[C]onsent decrees and settlement agreements are not, as a matter of law, mutually exclusive . . . ."); Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983) ("A consent decree is essentially a settlement agreement subject to continued judicial policing." (citations omitted)).

    Section 13.2 (ECF No. 1 ex. A § 13.2) of the Settlement Agreement expressly provides for continuing jurisdiction in the Bankruptcy Court and in this Court for

17

purposes of its enforcement.[13]  See P.J. ex rel. W.J. v. Katz, 550 Fed. App'x 20, 23

(2d Cir. 2013) (summary order) (settlement agreement is a consent decree due to

district court's continuing jurisdiction over it).  Further, it is clear both from the

Settlement Agreement itself and frp, the parties' submissions (ECF Nos. 30, 31)

that the parties specifically intend the Settlement Agreement to be subject to the

Court's approval and enforcement.  See Doe v. Pataki, 427 F. Supp. 2d 398, 405

(S.D.N.Y. 2006) (parties' intent controls whether a settlement agreement is treated

as a consent decree), modified, 439 F. Supp. 2d 324 (S.D.N.Y. 2006), vacated on

other grounds, 481 F.3d 69 (2d Cir. 2007).  For these reasons, the Settlement

Agreement is a governmental consent decree.

A district court may approve a proposed consent decree involving an

enforcement agency of the Government only if the decree is "fair and reasonable."[14]

Citigroup, 752 F.3d at 293.  To determine whether a governmental enforcement

decree is fair and reasonable, courts assess four key factors:

> (1) the basic legality of the decree; (2) whether the terms of
> the decree, including its enforcement mechanism, are
> clear; (3) whether the consent decree reflects a resolution
> of the actual claims in the complaint; and (4) whether the
> consent decree is tainted by improper collusion or
> corruption of some kind.

---

[13] Although this Court's Individual Rules of Practice in Civil Cases establish a presumption against
the retention of jurisdiction over settlement agreements except in unusual circumstances upon a
showing of good cause prior to submission of the settlement agreement, the procedural posture of
this case did not permit the parties to make such an advance showing of good cause, and accordingly
the Court waives this requirement with respect to the Settlement Agreement.

[14] This standard applies to consent judgments in cases involving federal environmental law, and not
just in the securities context in which it initially arose.  See United States v. IBM Corp., No. 14-cv-
936 (KMK), 2014 WL 3057960, at *1-2 (S.D.N.Y. July 7, 2014), clarified, 2014 WL 4626010 (Aug. 7,
2014).

Id. at 294-95 (citations omitted).  The "primary focus of the inquiry . . . should be on ensuring the consent decree is procedurally proper . . . taking care not to infringe on [the Government's] discretionary authority to settle on a particular set of terms." Id. at 295.  If the governmental enforcement decree includes injunctive relief, an additional requirement applies: the district court must ensure that the "public interest would not be disserved" by the approval and enforcement of the consent decree.  Id. at 294 (quoting eBay v. MercExchange, 547 U.S. 388, 391 (2006)). "Absent a substantial basis in the record for concluding that the proposed consent decree does not meet the requirements, the district court is required to enter the order."  Id. at 294.

Each of the Citigroup factors here counsels toward the approval of the Settlement Agreement.  First, it is clear that the Court has the authority to enter the decree under section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and the Government has the authority to enforce it under sections 107 and 113, id. §§ 9607, 9613.  Second, the terms of the decree, and its enforcement mechanism, are clearly stated in the Settlement Agreement: principally, defendants are to pay the Litigation Trust $5.15 billion in exchange for releases, covenants not to sue, and contribution protection, and the agreement may be enforced through actions before this Court and the Bankruptcy Court.  Third, the Settlement Agreement expressly resolves all of the claims asserted in the complaint, as well as related environmental matters.  Fourth, the record reflects that the Settlement Agreement was the product of arms-length negotiation among sophisticated parties represented

by competent and experienced counsel following years of intense litigation.  Finally, the settlement agreement does not disserve the public interest, because it facilitates the enforcement of federal environmental laws, resolves a proceeding that requires significant judicial resources to administer, and facilitates the more speedy and full compensation of Tronox's many creditors.

Accordingly, the Court approves the settlement agreement as a governmental consent decree.

\*      \*      \*

Accordingly, the Court OVERRULES all of the objections, ADOPTS the Bankruptcy Court's findings of fact and conclusions of law, and APPROVES the Settlement Agreement.

## V.    INJUNCTIVE RELIEF

The parties request that this Court issue a permanent injunction that enjoins certain parties from asserting any claim that could have been asserted against Anadarko or its affiliates by the Litigation Trust in the Adversary Proceeding or Tronox's chapter 11 bankruptcy case.  (See R&R ex. A at 2-3, 8, 16-17, 20-21.)  The Bankruptcy Court has endorsed the Injunction, finding it to be "narrowly tailored and appropriate under the circumstances," "limited in accordance with Second Circuit precedent," and "necessary and appropriate to carry out the provisions of the Bankruptcy Code."  (R&R at 27-31.)  Neither objector has specifically challenged the Injunction.

This Court has broad discretion to issue an injunction after "weigh[ing] the potential benefits and harm to be incurred by the parties from the granting or

denying of such relief." <u>Ticor Title Ins. Co. v. Cohen</u>, 173 F.3d 63, 68 (2d Cir. 1999)

(citing <u>Yakus v. United States</u>, 321 U.S. 414, 440 (1944)).  Such an injunction must

not disserve the public interest.  <u>Citigroup</u>, 752 F.3d at 296-97.

This Court agrees with the Bankruptcy Court's conclusions regarding the

propriety of issuing the requested permanent injunction.  Although the Injunction

does bar potential claims by third parties, the Injunction is carefully limited so that

it does not apply to any type of claim that could not have been litigated in this

action, including, <u>inter alia</u>, claims predicated on criminal liability, tax liability,

liability under the securities laws, actions to enforce the Settlement Agreement, or

liability for claims against Anadarko or Kerr-McGee that accrued after the spinoff of

Tronox in 2005.  The Injunction is also necessary to prevent entities other than the

Litigation Trust from exercising control or possession over property that has been

transferred to it.  Further, Anadarko and Kerr-McGee agreed to pay an historic

settlement amount in order to ensure that they would not have to re-litigate the

claims they aim to settle here, and without the requested injunction they may have

paid billions of dollars for nothing.  And the Injunction does not disserve the public

interest because, as stated above, it facilitates the enforcement of federal

environmental laws, resolves a proceeding that requires significant judicial

resources to administer, and facilitates the more speedy and full compensation of

Tronox's many creditors.

The Injunction is also consistent with Second Circuit precedent.  In a recent

case that involved a multi-billion dollar settlement of fraudulent transfer claims,

the Second Circuit upheld a permanent injunction that, like the one at issue here,

was "limited to third-party claims based on derivative or duplicative liability or

claims that could have been brought by the Trustee against the . . . releasees." In re

Bernard L. Madoff Inv. Sec. LLC, 740 F.3d 81, 89, 95 (2d Cir. 2014).

The Court therefore ISSUES the following permanent injunction, the terms of

which are defined in the Settlement Agreement:

> Pursuant to 28 U.S.C. §§ 1367 & 1651, § 105(a) of the
> Bankruptcy Code and Bankruptcy Rules 7001 and 7065, (i)
> any Debtor(s), (ii) any creditor of any Debtor who filed or
> could have filed a claim in the Chapter 11 Cases, (iii) any
> other Person whose claim (A) in any way arises from or is
> related to the Adversary Proceeding, (B) is a Trust
> Derivative Claim, or (C) is duplicative of a Trust Derivative
> Claim, and (iv) any Person acting or purporting to act as
> an attorney for any of the preceding is hereby permanently
> enjoined from asserting against any Anadarko Released
> Party (I) any Trust Derivative Claims or (II) any claims
> that are duplicative of Trust Derivative Claims, whether or
> not held or controlled by the Litigation Trust, or whether
> or not the Litigation Trust could have asserted such claims
> against any Anadarko Released Party.
>
> The injunction herein shall not apply to or bar the
> following: (i) any criminal liability; (ii) any liability arising
> under Title 26 of the United States Code (Internal Revenue
> Code) or state tax laws; (iii) any liability arising under
> federal or state securities laws; (iv) any action to enforce a
> covenant not to sue, release, or agreement not to seek
> reimbursement contained in the Settlement Agreement; (v)
> any liability that an Anadarko Released Party might have
> that does not arise from or through a liability of a Debtor;
> (vi) any liability of an Anadarko Released Party due to its
> status or acts or omissions since November 28, 2005 as a/an
> (A) owner, (B) operator, (C) discharger, (D) lessee, (E)
> permittee, (F) licensee, (G) person in charge, (H) holder of
> a right of use and easement, (I) arranger for disposal or
> treatment, (J) transporter, or (K) person who generates,
> handles, transports, treats, stores or disposes of solid or

hazardous waste; (vii) any liability relating to the E&P Business or the stored power or battery business (including, but not limited to, as owned or operated by U.S. Avestor LLC and Kerr-McGee Stored Power Company LLC[15]); and (viii) any liability that any Anadarko Released Party retained, received or assumed pursuant to the Assignment Agreement or Assignment, Assumption, and Indemnity Agreement.

For the avoidance of doubt, to the extent that a liability of an Anadarko Released Party excluded from the injunction herein by the preceding sentence would be a liability for which such Anadarko Released Party would be jointly and severally liable with others, including but not limited to one or more Debtors or Reorganized Debtors, under applicable law, nothing in this injunction is intended to alter any such applicable principles of joint and several liability where otherwise provided by law.

The injunction herein does not apply to the Litigation Trust and the United States, which are providing releases and covenants not to sue in the Settlement Agreement.

## VI.  CONCLUSION

For the foregoing reasons, the Court OVERRULES the objections in their entirety, ADOPTS all of the Bankruptcy Court's findings of fact and conclusions of law, APPROVES the Settlement Agreement in its entirety, and ISSUES the requested permanent injunction.  This Court and the Bankruptcy Court shall retain jurisdiction over any and all disputes arising under or otherwise relating to this Opinion & Order.  The parties to the Settlement Agreement are authorized and directed to take such action as is necessary to effectuate the terms of the Settlement

---

[15] Provided, however, that as it relates to Kerr-McGee Stored Power Company LLC, subpart (vii) is applicable only to the extent that such liability, if any, relates to or arises from the stored power or battery business.

Agreement.

SO ORDERED.

Dated:          New York, New York
                November 10, 2014

                                          _K— B . Fou_____
                                          KATHERINE B. FORREST
                                          United States District Judge

Copies to:

Anita Gregory
918 Osceola Street
Jacksonville, FL 32204
PRO SE

Hal H. McClanahan , III
P. O. Box 1091
Columbus, MS 39703-1091