USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 1, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

IN RE TRONOX INCORPORATED

TRONOX INCORPORATED, et al.,

                 Plaintiffs,

        -v-

ANADARKO PETROLEUM CORPORATION, et al.,

                 Defendants.

------------------------------------------------------------- X

14-cv-5495 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

       In November 2014, this Court approved a settlement resolving two lawsuits in which Tronox, Incorporated and affiliated entities (collectively, "Tronox")—all of which had filed chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")—and the United States government asserted fraudulent transfer and other claims against Kerr-McGee Corporation (referred to herein, for purposes of clarity, as "(new) Kerr-McGee Corp.") and its parent company, Anadarko Petroleum Corporation ("Anadarko"). See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.) ("Anadarko"), No. 14-CV-5495 KBF, 2014 WL 5825308 (S.D.N.Y. Nov. 10, 2014). As part of its approval of the settlement, this Court also issued a permanent injunction (the "Injunction") that prohibited creditors in Tronox's bankruptcy action and others from pursuing certain claims.

Now pending before the Court is a motion by (new) Kerr-McGee Corp. to enforce that Injunction against roughly 4,300 individuals (collectively, the "Avoca Plaintiffs") who have sought to restore to the active calendar of the Court of Common Pleas of Luzerne County, Pennsylvania (the "Pennsylvania Court"), a number of actions (referred to collectively as the "PA State Action") first filed in 2005 and then stayed pending resolution of Tronox's bankruptcy proceedings.  The PA State Action alleges tort claims arising from the operation of a wood treatment plant (the "Avoca Plant") formerly owned and operated by the predecessor of a Tronox affiliate.  (ECF No. 37.)  (New) Kerr-McGee Corp. asserts that the Injunction forecloses further litigation by the Avoca Plaintiffs of these claims; the Avoca Plaintiffs take a contrary position.[1]

(New) Kerr-McGee Corp.'s motion raises various issues that require consideration of the complicated corporate history of Tronox and (new) Kerr-McGee Corp., the nature of the claims barred by the Injunction, the issues resolved (and claims extinguished) in Tronox's bankruptcy, and the nature of any remaining live claims in the PA State Action.

The dispute between the parties concerns whether the Avoca Plaintiffs' sole remedy for their injuries in the PA State Action must come from proceeds of a litigation trust established as part of Tronox's plan of reorganization, or whether they may seek to supplement such recovery by pursuing claims against (new) Kerr-

---

[1] The parties agree that this Court has jurisdiction to interpret and enforce the Injunction. (December 3, 2015 Oral Arg. Tr. ("Arg. Tr.") at 13:5-16, ECF No. 62); see Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009) (recognizing a court's ability to interpret and enforce its own prior orders).

McGee Corp.  (New) Kerr-McGee Corp. was not itself a debtor in Tronox's bankruptcy, but had once been the ultimate parent of certain Tronox debtors.  The Avoca Plaintiffs have acknowledged that, as a result of Tronox's bankruptcy, any direct or indirect claims they may have against the Tronox debtors have been extinguished; but they vigorously assert that their PA State Action claims—filed more than a decade ago—against the non-debtor, (new) Kerr-McGee Corp., were unaffected by the bankruptcy or the Injunction.

The PA State Action alleges generally that the Avoca Plaintiffs suffered injuries as the result of operations at the Avoca Plant between the years 1956 and 1996.  The Avoca Plaintiffs' complaint asserts tortious conduct by the entities which operated that plant—all of which became debtors in the bankruptcy—as well as their parent entities.  The most direct parent entity (referred to herein as "(old) Kerr-McGee Corp.") ultimately became Tronox debtor entity Tronox Worldwide LLC; the ultimate, indirect parent of the Avoca Plant operator was (new) Kerr-McGee Corp., the movant herein.  Again, (new) Kerr-McGee Corp. was not a bankruptcy debtor.  In their PA State Action, the Avoca Plaintiffs assert both direct and indirect claims as to all parent entities (both the direct parent debtor and ultimate parent non-debtor).

As discussed below, the Avoca Plaintiffs' theories as to the nature of their claims against (new) Kerr-McGee Corp., and their position as to which claims remain live, have shifted in various filings to this and the Pennsylvania Court, and at oral argument on this motion.  In sum, they now concede (as they must) that all

claims asserted against any entity in existence during the period of tortious conduct—notably, between 1956 and 1996—have been extinguished in Tronox's bankruptcy.  It is both clear and uncontested that those entities became the Tronox debtor entities.  The Avoca Plaintiffs argue, however, that their complaint also asserts direct and indirect claims against (new) Kerr-McGee Corp. which were not extinguished—based on theories of vicarious liability, respondeat superior, alter ego, and veil piercing.

A key task necessary to resolution of this motion is therefore to decipher the nature of any claims asserted against the sole possible remaining defendant, (new) Kerr-McGee Corp.  The Court puts to one side an important fact, which is that all of the tortious conduct set forth in the Avoca Plaintiffs' complaint relates to actions occurring within a time period predating the conceded date of existence of (new) Kerr-McGee Corp.; the Court will return to that later in this Opinion.  The task of deciphering the claims is complicated by the fact that the Avoca Plaintiffs' complaint treats as a single entity (under the general name "Kerr-McGee Corp.") what were in fact three separate entities who were—at various times—the parent entities of the Avoca Plant's operator: (1) the original parent of the operating company, Kerr-McGee Corp. (i.e. (old) Kerr-McGee Corp.), (2) that entity's successor, Kerr-McGee Operating Corp. (which became the debtor Tronox Worldwide LLC), and (3) an entity also confusingly called "Kerr-McGee Corp." that did not come into existence until 2001 (originally as an entity named "Kerr-McGee HoldCo, Inc.", and renamed "Kerr-McGee Corp." in 2005).  This third entity is (new)

Kerr-McGee Corp., the movant herein.  The Avoca Plaintiffs' complaint does not distinguish between these three entities.

At oral argument on this motion, counsel for the Avoca Plaintiffs conceded that the key allegations in the PA State Action against the movant herein are set forth in paragraph 21 of the complaint.  In that paragraph, the Avoca Plaintiffs allege that "Kerr-McGee Corp." "provided environmental policies, legal counsel, hydrological services and laboratory technical services in connection with the operation of the wood treatment plant," "communicated with environmental agencies and approved and controlled environmental budgets and expenditures," and directed personnel in connection with, inter alia, emission controls and toxic waste handling.  (Decl. of Donald A. Soutar, Ex. A ("Master Complaint") ¶ 21, ECF No. 44.)  The counts setting forth the causes of action—of which there are 37—refer to claims such as battery, negligence, wrongful death, fraudulent misrepresentation, ultra-hazardous activity, trespass, nuisance, and the Pennsylvania Hazardous Sites Cleanup Act.  There is no separate claim against any of the parent defendants, nor is there a prayer for relief which seeks separate relief against them.  In short, the liability of any of the three parent entities—two of whom were bankruptcy debtors and one of whom (the movant herein) was not—requires a determination of liability on a specific tort claim against the operating company debtor entity.

The Avoca Plaintiffs contend that the debtors' underlying liability for operating the Avoca Plant has been established by prior arbitrations in the PA

State Action and findings of fact made by United States Bankruptcy Judge Allan L. Gropper in the adversary proceeding against (new) Kerr-McGee Corp.  As discussed below, however, the arbitrations did not reach the issues necessary to a final adjudication of the claims in the PA State Action, and Judge Gropper's findings in the adversary proceeding are of no help as they were superseded by a settlement and thus never became final and binding.

All of this takes some time to sort through, but at the end of the day the answer to the core question posed to this Court is clear: Tronox's bankruptcy proceeding has extinguished the Avoca Plaintiffs' claims in the PA State Action.  No plausible claim is left for the Avoca Plaintiffs to pursue against (new) Kerr-McGee Corp.  While the Avoca Plaintiffs evinced an intent to carve out such claims during settlement discussions in Tronox's bankruptcy, intent alone cannot breathe life into that which has ceased to exist.  There are several separate paths to this conclusion.

First, as a matter of law, no plausible direct claim can exist for assault, battery, negligence, and other claims (including within those claims the allegations of direct parental control of policies and decision-making), by a corporate entity, (new) Kerr-McGee Corp., that did not exist until several years after the events at issue.

Second, to the extent that the Avoca Plaintiffs believe that the concepts of alter ego, veil piercing, or respondeat superior allow them to make claims solely against (new) Kerr-McGee Corp., without involving the Tronox debtors, they are mistaken.  The concepts of alter ego, veil piercing and respondeat superior are

remedial—they are designed to enable a plaintiff who would not be able to obtain a remedy from the direct corporate actor to seek it from a controlling parent whose legal separateness was, in actuality, a fiction. The doctrines ensure that plaintiffs who obtain a liability determination are not left without a remedy as a result of corporate shenanigans; as pled here, they are decidedly not a stand-alone cause of action against a parent. Those theories require the predicate establishment of liability against a subsidiary or affiliate, but here that predicate is specifically and finally foreclosed.

Here, the Avoca Plaintiffs settled their claims against Tronox—they accepted a share of the proceeds obtained by the "Anadarko Litigation Trust"[2] as their sole recourse against the Tronox debtors. That settlement meant that the Avoca Plaintiffs could not pursue avenues of recovery for <u>Tronox's</u> liability beyond their share of the trust proceeds.

Third, the Injunction prohibits pursuit of the Avoca Plaintiffs' alter ego, veil piercing, and respondeat superior claims. As explained below, the Injunction prohibits Tronox's creditors from asserting any claims that were or could have been asserted by Tronox's trustee in the adversary proceeding against (new) Kerr-McGee Corp. The scope of claims that could have been brought in that adversary proceeding includes any claims that could have been brought against (new) Kerr-

---

[2] The Anadarko Litigation Trust was created as part of the Tronox debtors' bankruptcy reorganization plan, the First Amended Joint Plan of Reorganization of Tronox, Inc. (the "Plan"). The Plan transferred the Tronox debtors' interest in and obligation to pursue the claims asserted in Tronox's adversary proceeding against (new) Kerr-McGee Corp. and the other defendants in that proceeding. As explained below, Tronox's Plan provided the tort claimants in Tronox's bankruptcy a right to a share of the proceeds ultimately recovered by the Anadarko Litigation Trust.

McGee Corp. by the trustee of the Tronox estate.  The trustee, in turn, had the power to assert, on behalf of Tronox's creditors, claims that arise from liabilities that are derived from or through Tronox that are generalized and common to all creditors.  The Avoca Plaintiffs' theories of liability against (new) Kerr-McGee Corp.—insofar as they seek to hold that entity responsible for Tronox's conduct as the alter ego of, or based on a theory of veil piercing—are generalized and common to all creditors, and are therefore barred by the Injunction.  In this regard, the Avoca Plaintiffs' focus on the nature of their injuries versus the theory by which they seek to obtain redress from (new) Kerr-McGee Corp. is misguided.

Fourth, the Avoca Plaintiffs' own admissions as to how they would intend to prove their claims against (new) Kerr-McGee Corp. shows that their claims are barred by the Injunction.  At oral argument, the Avoca Plaintiffs conceded that they would seek to rely on liability findings in the PA State Action against the Tronox debtors, as well Judge Gropper's findings of fact in the adversary proceeding against (new) Kerr-McGee Corp., to prove their alter ego and veil piercing claims. According to the Avoca Plaintiffs, their theories of getting to a non-debtor require steps necessarily involving debtors.  As a first step (after establishing liability for the tort claim, which has its own issues), they would seek to pierce the corporate veil at the initial step between the debtor operating company of the Avoca Plant (Tronox LLC), and its direct parent, also a debtor (Tronox Worldwide LLC).  But, the Injunction released any such claim for veil piercing as between these two entities.  The necessary next step—in which debtor Tronox Worldwide LLC pierces

the veil between it and its former parent, non-debtor (new) Kerr-McGee Corp.—is similarly prohibited by the Injunction.  It does not help if the veil piercing claim is pursued by the Avoca Plaintiffs instead of by debtor Tronox Worldwide LLC.  To succeed, such a claim still requires litigated veil piercing at both levels.  And veil piercing assumes an underlying liability—but that underlying liability is not established.  Judge Gropper's findings are of little assistance as they relate to entirely different legal claims (actual and constructive fraudulent conveyance versus alter ego or veil piercing) and were in any event never entered as a final appealable order because the adversary action was ultimately settled.  Judge Gropper's findings are, in short, not preclusive or binding as a matter of law.

Accordingly, for the reasons set forth below, Kerr-McGee's Corp.'s motion to enforce the Injunction is therefore GRANTED.  The Avoca Plaintiffs are ORDERED to abide by the terms of the Injunction, and to therefore dismiss their actions in the Pennsylvania Court against (new) Kerr-McGee Corp. (and the Tronox debtors) with prejudice, and make no attempt to file any actions making similar claims against (new) Kerr-McGee Corp. (or the Tronox debtors) in any other forum.

I.     BACKGROUND

A.     Corporate History of Tronox / Kerr-McGee Corp.

Before turning to the specifics of the Avoca Plaintiffs' allegations, it is necessary to lay out the relationship and relevant roles played by the four defendants in the PA State Action.  To understand each defendant's role, the Court must explain certain aspects of Kerr-McGee Corp.'s and Tronox's complex corporate history.  Although tedious, this exercise is an important one.  The purpose of the

below factual recitation is to explain why—based on the Avoca Plaintiffs' own concessions—it is not theoretically possible for the movant herein to have had any role or have taken any action with respect to the operation of the wood treatment plant (i.e. the Avoca Plant) that serves as the basis for the Avoca Plaintiffs' injuries.

As detailed below, the Avoca Plaintiffs' own concessions show that (new) Kerr-McGee Corp. did not exist at the time the Avoca Plant was in operation; it therefore could not have taken direct actions alleged in the Avoca Plaintiffs' complaint.[3]  To assert otherwise is not plausible.[4]  Instead, predecessors of debtors Tronox LLC (which at one time was known as Kerr-McGee Chemical, LLC) and Tronox Worldwide LLC (whose predecessor names included Kerr-McGee Corporation and Kerr-McGee Operating Corp.) were responsible for all relevant conduct relating to the operation and oversight of the Avoca Plant.  Apparent ambiguity and confusion on this point was created by the fact that two distinct entities have operated under the name "Kerr McGee Corporation."  The following chart, which, as noted, was provided by (new) Kerr-McGee Corp. at oral argument

---

[3] The sources for the Court's factual recitation are the Master Complaint, the Avoca Plaintiffs' motion to restore jurisdiction to the Pennsylvania Court, and the "Amended Joint Fact Stipulations of the Parties" in Tronox's adversary proceeding against (new) Kerr-McGee Corp. and the Bankruptcy Court's resulting trial decision, both of which the Avoca Plaintiffs accept as accurate for purposes of this motion.  The Court also relies on the helpful chart used by (new) Kerr-McGee Corp. at oral argument (Court Ex. 1, ECF No. 59), which the Avoca Plaintiffs also accepted as accurate (see Arg. Tr. at 59:9-16).

[4] As discussed below, the Avoca Plaintiffs contend that this Court is not the proper forum to make such a finding, and that doing so is akin to summary judgment and should be left to the Pennsylvania Court.  It is well within this Court's jurisdiction to determine whether a claim asserted to be (1) released in bankruptcy and (2) a derivative claim, states a different, plausible claim.  See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 229 (2d Cir. 2002) (stating that bankruptcy jurisdiction exists after a plan of reorganization has become effective when the proceeding is "not independent of the reorganization"); Savoy Senior Housing Corp. v. TRBC Ministries, LLC, 401 B.R. 589, 596-97 (S.D.N.Y. 2009); In Re Charter Commc'ns, 09-11435(JMP) 2010 WL 502764, at *3 (Bankr. S.D.N.Y. Feb. 8, 2010).

and conceded to be accurate by the Avoca Plaintiffs, serves as a helpful visual aid to the Court's succeeding factual recitation.[5]



There are several important points to note from this chart.  First, that the <u>movant</u> herein is the defendant entity listed in the second row in the second column: Kerr-McGee Corp. f/k/a Kerr-McGee Holdco, Inc.  This is the entity this Court refers to as (new) Kerr-McGee Corp.  The chart clearly shows it did not exist during the period of the Avoca Plant's operations.  (Old) Kerr-McGee Corp., as well as its successor Kerr-McGee Operating Corp., which are listed in the third row of the first and second columns, are shown as having existed at the time of the Avoca Plant's operations, and becoming one of the debtors, Tronox Worldwide (LLC).  The actual operators of the Avoca Plant are listed in the bottom row, starting out as Kerr-McGee Chemical Corp., then Kerr-McGee Chemical LLC, and then finally becoming debtor Tronox LLC.

---

[5] The one change suggested by the Avoca Plaintiffs' counsel was that (new) Kerr-McGee Corp. was both a non-debtor and creditor in the Tronox bankruptcy.  (Arg. Tr. at 28:21-23.)

The key facts leading to this corporate history are agreed:

On November 1, 1965, Kerr-McGee Oil Industries, Inc., which by then had acquired the entity that owned the Avoca Plant, changed its name to Kerr-McGee Corporation (i.e. the (old) Kerr-McGee Corporation).  (Decl. of Stephen Scotch-Marmo, Ex. 1 ("Amended Joint Fact Stipulations") ¶ 14, ECF No. 48-1; Master Complaint ¶¶ 10-12.)  On or about September 1, 1974, Kerr-McGee Chemical Corporation, a wholly owned subsidiary of (old) Kerr-McGee Corporation, became the direct owner and operator of the Avoca Plant.  (Master Complaint ¶¶ 13-14.)  On or about January 1, 1998, Kerr-McGee Chemical Corporation merged into Kerr-McGee Chemical, LLC.  (Master Complaint ¶ 15.)

On May 13, 2001, (old) Kerr-McGee Corporation and HS Resources, Inc. entered into an Agreement and Plan of Merger pursuant to which (old) Kerr-McGee Corporation would acquire HS Resources, Inc.  (Amended Joint Fact Stipulations ¶ 34.)  On May 24, 2001, (old) Kerr-McGee Corporation engaged in a series of corporate restructurings to effectuate the acquisition, including by the creation of two new entities called Kerr-McGee Merger Sub, Inc. and Kerr-McGee Holdco, Inc. (Amended Joint Fact Stipulations ¶¶ 35-38.)  On August 1, 2001, (old) Kerr-McGee Corporation was merged into Kerr-McGee Merger Sub, Inc., with (old) Kerr-McGee Corporation surviving as a wholly-owned subsidiary of Kerr-McGee Holdco, Inc. under the name Kerr-McGee Operating Corporation.  (Amended Joint Fact Stipulations ¶ 39.)  Kerr-McGee Holdco, Inc. became the new ultimate parent company of the organization.  (Amended Joint Fact Stipulations ¶ 39.)  Also on

August 1, 2001, Kerr-McGee Holdco, Inc. was renamed Kerr-McGee Corporation (i.e. the (new) Kerr-McGee Corp., the movant herein).  (Amended Joint Fact Stipulations ¶ 40.)

As they only came into existence in 2001, neither Kerr-McGee Holdco, Inc. nor (new) Kerr-McGee Corp. existed during the time that other Kerr-McGee entities operated the wood treatment plant whose operations gave rise to the PA State Action.

Through a series of mergers and name changes, Kerr-McGee Operating Corporation (the successor of (old) Kerr-McGee Corporation) ultimately became Tronox Worldwide LLC on September 12, 2005.  (Amended Joint Fact Stipulations ¶ 42.)  Similarly, through a series of mergers and name changes, Kerr-McGee Chemical, LLC ultimately became Tronox LLC on September 15, 2005.  (Amended Joint Fact Stipulations ¶ 43.)  From at least December 31, 2002 through November 28, 2005, Tronox LLC was a wholly-owned subsidiary of Tronox Worldwide LLC. (Amended Joint Fact Stipulations ¶ 43.)

The explanation for the above series of corporate restructurings and name changes is that, in or about 2002, (new) Kerr-McGee Corp. began a process of severing its chemical businesses (including the Avoca Plant) and all associated legacy tort and environmental liabilities from its much more profitable oil and gas businesses.  Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.), 503 B.R. 239, 253 (Bankr. S.D.N.Y. 2013).  In 2005, (new) Kerr-McGee Corp. and Kerr-McGee Operating Corporation (which had been (old) Kerr-McGee Corp. and subsequently

became Tronox Worldwide LLC) entered into a series of agreements that documented the terms of separation, which ultimately resulted in a formal split of their properties.  Id. at 253-54.  The spin-off of Tronox was finally completed on March 30, 2006, when the (new) Kerr-McGee Corp. divested itself of all outstanding Tronox stock.  Id. at 258-59.[6]  Anadarko acquired (new) Kerr-McGee Corp. in May 2006 after the Tronox spin-off was completed.  (Decl. of Duke K. McCall, Ex. 1 ("Avoca Motion") ¶ 71, ECF No. 46-1; see Arg. Tr. at 25:16-17 ("[T]here was a legal spinoff of these entities in '06 and as far as I know everything went with them.").)

B.    PA State Action

The Avoca Plaintiffs are 4,357 individuals who resided and/or worked near the Kerr-McGee Wood Treatment Plant in Avoca, Luzerne County, Pennsylvania, which was in operation from 1956 until 1996 (i.e. the Avoca Plant).  (Avoca Motion ¶¶ 1, 3, 10.)  Beginning on January 3, 2005, the Avoca Plaintiffs filed complaints against four entities—Kerr-McGee Chemical, LLC, Kerr-McGee Operating Corp., "Kerr-McGee Corporation", and Kerr-McGee Holdco—alleging tort claims based on the operation of the Avoca Plant.  (Avoca Motion ¶ 2.)[7]  The Avoca Plaintiffs' complaints were ultimately consolidated into a single action (the aforementioned PA

---

[6] This separation was the core issue in the fraudulent conveyance claims litigated in the adversary proceeding in the Tronox bankruptcy.  See id. at 266.

[7] The complaint also names Jeffrey F. Snyder, Joseph P Cottone and T.P. Corporation as defendants. Those defendants are irrelevant to the pending motion and therefore the Court does not discuss these defendants further.

14

State Action); the "Master Complaint" pertains to a subset of their claims.  (Avoca Motion ¶¶ 8-9; see Master Complaint.)[8]

The Master Complaint alleges that from 1956 through 1996, the operations at the Avoca Plant resulted in the intentional, negligent and otherwise tortious release of dangerous chemicals into the environment, which harmfully and continuously contacted the Avoca Plaintiffs, causing cancer and other illnesses. (Master Complaint ¶¶ 2-3.)  As discussed above, the Master Complaint lumps various "Kerr-McGee" parent entities together and then alleges that "Kerr-McGee Corp." is liable for the Avoca Plaintiffs' injuries based on theories of both indirect liability due to its relationship with affiliates, and based on its own conduct. (Master Complaint ¶¶ 19-21.)  The pertinent allegations are as follows:

> Defendant, Kerr-McGee Chemical Corporation, was one of many companies that were/are wholly owned subsidiaries of Defendant, Kerr-McGee Corporation.  Defendant, Kerr-McGee Chemical Corporation, and its predecessors were all corporate shells and/or alter egos of Defendant, Kerr-McGee Corporation, and in all instances herein acted as the agent of Defendant, Kerr-McGee Corporation.  Kerr-McGee Chemical Corporation and its predecessors, like a number of their other sister companies, have never maintained sufficient control over their own entities.  Defendant, Kerr-McGee Corporation so dominated Kerr-McGee Chemical Corporation and its predecessors that Kerr-McGee Chemical Corporation and its predecessors had no separate existence, but merely were conduits for Defendant, Kerr-McGee Corporation.
>
> ***
>
> Since 1956, all actions taken in respect to the wood treatment plant were taken by Kerr-McGee Chemical Corporation and its predecessors, acting in conjunction with Defendant, Kerr-McGee Corporation as a single economic

---

[8] At least for purposes of this motion, the Avoca Plaintiffs have not argued that the Master Complaint differs in any material way from the other complaints relating to other injuries that remain active in the Pennsylvania Court.  Thus, although the Court at times refers only to the "Master Complaint" going forward, the Court's reasoning applies equally to all of the active complaints in the PA State Action.

> entity.  Defendant, Kerr-McGee Corporation, engaged in deliberate and
> purposeful misuse of the corporate forms of Kerr-McGee Chemical
> Corporation and its predecessors.  The corporate veils of Kerr-McGee
> Chemical Corporation and its predecessors have been disregarded by
> Defendants.  The corporate veils of Kerr-McGee Chemical Corporation and its
> predecessors must be pierced to avoid unfairness, injustice and further injury
> to Plaintiffs.

(Master Complaint ¶ 19.)  The Master Complaint alleges an additional basis for

indirect liability based on a theory of vicarious liability, as follows:

> Alternatively, Kerr-McGee Chemical Corporation and its predecessors acted
> as agents and/or servants of Defendant, Kerr-McGee Corporation.  Therefore,
> Defendant, Kerr-McGee Corporation, is vicariously liable for the actions of
> Kerr-McGee Chemical Corporation and its predecessors and/or is liable under
> the doctrine of respondeat superior.

(Master Complaint ¶ 20.)

The Master Complaint also alleges that "Kerr-McGee Corp." is directly liable

for the Avoca Plaintiffs' injuries, stating:

> Defendant, Kerr-McGee Corporation, provided environmental policies, legal
> counsel, hydrological services and laboratory technical services in connection
> with the operation of the wood treatment plant.  Furthermore, Defendant,
> Kerr-McGee Corporation, communicated with environmental agencies and
> approved and controlled environmental budgets and expenditures in
> connection with the wood treatment plant.  Defendant, Kerr-McGee
> Corporation, controlled the wood treatment plant's facility's environmental
> changes and monitoring and also directed the Plaintiffs' managers as to
> environmental policies and decisions, including emission controls, regulatory
> compliance issues, regulatory reporting and toxic waste handling.

(Master Complaint ¶ 21.)  The Master Complaint further alleges:

> Defendant, Kerr-McGee, was aware of the environmental damage caused by
> their wood treatment plant and related work product and the resulting
> contamination to the air, water and soil, which led to and/or caused serious
> and permanent health impairment, disease, illness and death to individuals
> who came in direct and/or indirect contact with the same.

(Master Complaint ¶ 22.)

16

All of the allegations in the Master Complaint relate to conduct occurring during the time period from 1956 through 1996.  And, while (new) Kerr-McGee Corp. is specifically mentioned in paragraph 18 (Master Complaint ¶ 18), there are no allegations of wrongful conduct initiated in the period following its creation in 2001.

In 2007, the PA State Action was stayed while two groups of the Avoca Plaintiffs arbitrated their claims and obtained binding arbitration awards, including (apparently) against (new) Kerr-McGee Corp.  (See Avoca Motion ¶¶ 17-26.)  In finding the defendants liable, the arbitrator necessarily concluded that their conduct had caused or contributed to the Avoca Plaintiffs' injuries.  (Avoca Motion ¶¶ 22, 25.)

    C.    <u>Tronox Bankruptcy</u>

On January 12, 2009, Tronox LLC and Tronox Worldwide LLC, along with their affiliates, filed a Voluntary Petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  (Avoca Motion ¶ 29.)  On January 20, 2009, the defendants in the PA State Action filed a Suggestion of Bankruptcy in the Pennsylvania Court, resulting in a stay of that action and all related arbitration proceedings.  (Avoca Motion ¶¶ 29-31.)  As part of its bankruptcy, in May 2009 Tronox filed an adversary proceeding (the "Adversary Proceeding") against (new) Kerr-McGee Corp. and its parent Anadarko, alleging that the transactions resulting in the Tronox spin-off amounted to an actual and constructive fraudulent conveyance.  (Avoca Motion ¶ 32); <u>see also</u> <u>Anadarko</u>, 2014 WL 5825308, at *2.  A

few weeks later, the United States filed a complaint-in-intervention, asserting claims under the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3301 et seq. Anadarko, 2014 WL 5825308, at *2.  Every one of the Avoca Plaintiffs filed proofs of claim in the bankruptcy (Avoca Pls.' Opp. Br. at 1, 21, ECF No. 43), but explicitly asserted that they reserved all rights with respect to claims against any non-debtors (see Decl. of Duke K. McCall, Ex. 2, ECF No. 46-2).

On or about November 5, 2010, the Bankruptcy Court confirmed the First Amended Joint Plan of Reorganization of Tronox, Inc.  (Avoca Motion ¶ 34.)[9] Among other things, the Plan created and transferred Tronox's interest in and obligation to pursue the fraudulent conveyance claims in the Adversary Proceeding to the "Anadarko Litigation Trust."  (Avoca Motion ¶ 35; see also Plan at Art. IV(C)(5).)  The Plan provided that, among others, "representatives of the holders of Tort Claims will have certain agreed rights concerning the pursuit" of the Adversary Proceeding.  (Plan at Art. IV(C)(5).)

The Plan also created a "Tort Claims Trust" to serve as the Avoca Plaintiffs' (and other tort claimants') sole recourse for claims against the Tronox estate. (Avoca Motion ¶ 35; see also Plan at Art. IV(C)(4).)  The Plan initially funded the Tort Claims Trust with certain assets, but provided that, in addition, it was entitled to a percentage of any recovery by the Anadarko Litigation Trust in the Adversary Proceeding.  The Plan also contained a release with regard to creditors' claims, and an injunction applicable to creditors prohibiting pursuit of claims against the

---

[9] The Plan is filed in the Bankruptcy Court as Dkt. No. 2567-1 in Case No. 09-10156.

Tronox debtors.  (Avoca Motion ¶¶ 36-37.)  The Plan also specified that nothing in it
"shall in any way release any claim against or liability of . . . [(new)] Kerr-McGee
Corporation and Anadarko."  (Avoca Motion ¶ 38.)  The Plan became effective on
February 14, 2011.  (Avoca Motion ¶ 39.)

Thereafter, the Anadarko Litigation Trust and the United States jointly
pursued the Adversary Proceeding in the Bankruptcy Court.  Anadarko, 2014 WL
5825308, at *2.  (New) Kerr-McGee Corp. and its parent, Anadarko, were
defendants in this proceeding.  After over two years of further litigation, on
December 12, 2013, Judge Gropper issued a Memorandum of Opinion in which he
held, inter alia, that (new) Kerr-McGee Corp. and the other defendants in the
Adversary Proceeding had "acted with intent to 'hinder and delay' [Tronox's]
creditors when they transferred out and then spun off the oil and gas assets, and
that the transaction, which left [Tronox] insolvent and undercapitalized, was not
made for reasonably equivalent value."  In re Tronox Inc., 503 B.R. at 249.  At the
time of issuance, this decision did not constitute a final judgment as damages
remained to be determined.  See id. at 347.  Judge Gropper indicated that the
measure of damages was between $5.15 billion and $14.16 billion; he reserved
decision on the precise measure of damages pending additional submissions and
briefing by the parties.  (Avoca Motion ¶ 72.)

On April 3, 2014, prior to the Bankruptcy Court taking further action on the
issue of damages, and importantly, before final judgment was entered, the parties

settled the Adversary Proceeding for $5.15 billion (the "Settlement Agreement").[10]
(Avoca Motion ¶ 73.)  The Settlement Agreement was conditioned on, <u>inter alia</u>,
entry of an injunction (the relevant terms of which are set forth below) barring
certain claims against Anadarko and its affiliates.  Parties potentially affected by
the injunction, including the Avoca Plaintiffs, received notice of the settlement and
opportunity to object.  <u>Anadarko</u>, 2014 WL 5825308, at *3.  None of the Avoca
Plaintiffs did so.

On May 30, 2014, the Bankruptcy Court entered a Report &
Recommendation in which it recommended approval of the Settlement Agreement
and entry of an Order approving it by this Court.  (Avoca Motion ¶ 74.)  On
November 10, 2014, this Court issued an Opinion & Order approving the
Settlement Agreement and issuing the requested injunction.  <u>See Anadarko</u>, 2014
WL 5825308.  In relevant part, the Injunction stated:

> (i) any Debtor(s), (ii) any creditor of any Debtor who filed or could have filed a
> claim in the Chapter 11 Cases, (iii) any other Person whose claim (A) in any
> way arises from or is related to the Adversary Proceeding, (B) is a Trust
> Derivative Claim, or (C) is duplicative of a Trust Derivative Claim, and (iv)
> any Person acting or purporting to act as an attorney for any of the preceding
> is hereby permanently enjoined from asserting against any Anadarko
> Released Party (I) any Trust Derivative Claims or (II) any claims that are
> duplicative of Trust Derivative Claims, whether or not held or controlled by
> the Litigation Trust, or whether or not the Litigation Trust could have
> asserted such claims against any Anadarko Released Party.
>
> The injunction herein shall not apply to or bar the following: . . . (v) any
> liability that an Anadarko Released Party might have that does not arise
> from or through a liability of a Debtor; . . .

---

[10] The Settlement Agreement is filed in the Bankruptcy Court as Dkt. No. 2983-1 in Case No. 09-10156.

20

Id. at *10.  Certain terms used in the Injunction are defined in the Settlement

Agreement, including the terms "Debtors", "Anadarko Released Party" and "Trust

Derivative Claim."  Id.  The term "Debtors" is defined to include, inter alia, Tronox

LLC and Tronox Worldwide LLC.  (Settlement Agreement § 1.29.)  The Settlement

Agreement also defined the terms "Adversary Proceeding", "Anadarko Released

Party", and "Trust Derivative Claims", as follows:

> § 1.2. "'Adversary Proceeding' shall mean the adversary proceeding pending
> in the Bankruptcy Court captioned Tronox Incorporated, et al. v. Anadarko
> Petroleum Corporation, et al., Adversary Proceeding No. 09-1198 (ALG),
> including the claims asserted in the Second Amended Adversary Complaint,
> all claims and/or remedies that a Debtor transferred to the Litigation Trust
> that were asserted or could have been asserted in this adversary proceeding,
> and the claims asserted in the Complaint-in-Intervention and that could have
> been asserted in the Complaint-in-Intervention relating to the subject matter
> of this adversary proceeding.

> § 1.9. "'Anadarko Released Parties' shall mean Anadarko and each of its
> Affiliates [including Kerr-McGee Corp.], and each of their respective
> predecessors, successors, and assigns, all of their past, present, and future
> officers, directors, employees, managers, members, agents, attorneys and
> other representatives.

> § 1.82. "'Trust Derivative Claims' shall mean any and all claims and/or
> remedies that are held and/or controlled by, and which were or could have
> been asserted by, the Litigation Trust against any Anadarko Released Party,
> seeking relief or recovery arising from harm to any Debtor or any Debtor's
> estate, based on any legal theory including, without limitation, such claims
> and/or remedies under federal or state law, statutory or common law, in
> equity or otherwise, arising out of or in any way related to (i) the Adversary
> Proceeding; (ii) the Chapter 11 Cases; (iii) the Bankruptcy Claims; (iv) the
> Covered Sites; and/or (v) any Anadarko Released Party's ownership,
> management, operation, status, tenure, conduct, omission, action or inaction
> at any time as a stockholder, affiliate, owner, partner, member, manager,
> director, officer, employee, servant, agent, representative, attorney, creditor,
> successor, assign or other relationship with a Debtor and/or any of its
> predecessors, in each case, including, without limitation, such claims and/or
> remedies that are actions, causes of action, lawsuits, suits, claims,
> counterclaims, cross-claims, liabilities, interests, judgments, obligations,

rights, demands, debts, damages, losses, grievances, promises, remedies, liens, attachments, garnishments, prejudgment and post-judgment interest, costs and expenses (including attorneys' fees and costs incurred or to be incurred), including Unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, <u>alter ego, corporate veil piercing</u>, usurpation of corporate opportunity, successor liability, breach of contract, fraud, intentional, reckless or negligent misrepresentation, contribution, indemnity, and all other such claims and/or remedies.

(Settlement Agreement §§ 1.2, 1.9, 1.82 (emphasis added).)

The Court stated that it and the Bankruptcy Court would "retain jurisdiction over any and all disputes arising under or otherwise relating to this Opinion & Order." <u>Id.</u> at *11.  The parties' settlement became final on January 20, 2015, when the period for filing an appeal of the decision approving the Settlement Agreement expired.  (Avoca Motion ¶ 77.)

D.      <u>Post-Injunction Litigation</u>

On September 4, 2015, the Avoca Plaintiffs filed a motion in the Pennsylvania Court seeking that court's acknowledgment of jurisdiction, restoration of the consolidated cases to the active docket, and a case management conference establishing deadlines.  (<u>See</u> Avoca Motion.)  The Avoca Motion provides a detailed history of the PA State Action, the Tronox bankruptcy, and the Adversary Proceeding, and then requests that the Pennsylvania Court return the PA State Action to the active docket on the ground that the automatic stay has been lifted and the Adversary Proceeding has concluded.  (Avoca Motion ¶¶ 91, 94.)  The Avoca

22

Motion does not indicate the Avoca Plaintiffs' view as to the extent to which their case was narrowed by the Tronox bankruptcy and the Settlement Agreement, nor does it contain any explicit request for leave to amend the complaints (for instance, to alter the nature of allegations against (new) Kerr-McGee Corp.). (See Avoca Motion ¶¶ 104-24.)

That being said, an even cursory review of the Avoca Motion—let alone the close reading undertaken by the Court—shows that the Avoca Plaintiffs' claims in the PA State Action depend entirely on allegations relating to the direct liability of the Tronox debtor defendants. Such direct claims are foreclosed by the release of claims in the Plan. As the Court explained at the outset of oral argument on (new) Kerr-McGee Corp.'s motion, the Avoca Motion leaves the impression that the Avoca Plaintiffs seek to reopen the entirety of their case, including against the Tronox debtor defendants. (Arg. Tr. at 4:20-24.) The Court further observed that the Avoca Motion appears as if it was "written by a different person than that person who is litigating the case right now" and that "it is clearly the case that the motion to restore is written as if somebody thinks they can go back after Tronox, LLC and Tronox Worldwide." (Arg. Tr. at 7:13-18.) The Court added that only a single paragraph in the Avoca Motion, paragraph 51, "saves the [Avoca Motion] from being entirely directed towards [Tronox] Worldwide." (Arg. Tr. at 8:1-3.) Although, as discussed below, the Court considers all of the parties' filings in consideration of (new) Kerr-McGee Corp.'s motion, the Court's view as to the Avoca Plaintiffs'

position with respect to that litigation, and their intent, is informed by the Avoca Motion. The statements made in those papers are revealing.

On October 9, 2015, (new) Kerr-McGee Corp. filed the instant motion in this Court to enforce the Injunction issued as part of the settlement of the Adversary Proceeding, a settlement to which the Avoca Plaintiffs agreed and from which they receive certain benefits. (ECF No. 37.) The motion seeks, <u>inter alia</u>, an Order from this Court enjoining the Avoca Plaintiffs and their counsel from further pursuing claims against (new) Kerr-McGee Corp. and directing them to dismiss the PA State Action with prejudice against (new) Kerr-McGee Corp. (Kerr-McGee Corp.'s Opening Br. at 14, ECF No. 38.)[11] The Avoca Plaintiffs opposed the motion on October 26, 2015. (ECF No. 43.) Kerr-McGee Corp. filed a reply on November 2, 2015. (ECF No. 47.) With leave of the Court (ECF No. 55), the Avoca Plaintiffs filed a sur-reply on November 20, 2015 (ECF No. 56). On December 3, 2015, the Court held oral argument on the motion. (<u>See</u> Arg. Tr., ECF No. 62.)

At oral argument, this Court learned that the Pennsylvania Court held a hearing on the Avoca Motion on October 30, 2015, and informed the parties that it would wait to take any further action pending a decision in this Court. (Arg. Tr. at 69:13-21.)[12]

---

[11] In its opening brief, (new) Kerr-McGee Corp. also sought an "order to show cause why the Avoca Plaintiffs and their counsel should not be held in contempt for violating the Injunction . . . ." (Kerr-McGee's Opening Br. at 14.) Because (new) Kerr-McGee Corp. provided no legal standards or argument in support of that request, and it did not renew its request for an order to show cause in its reply brief or at oral argument, the Court deems this request abandoned.

[12] On January 26, 2016, Tronox LLC and Tronox Worldwide Pty. Ltd. (formerly known as Tronox Worldwide LLC)—the Tronox debtor entities named as defendants in the PA State Action—filed a brief informing the Court that the Avoca Plaintiffs have refused to sign a stipulation of dismissal in the PA State Action as to them. (Tronox Br. at 3-4, ECF No. 64.) The Tronox debtors ask this Court

II.   LEGAL STANDARDS

A.   Scope of Bankruptcy Jurisdiction

"Generally, a discharge in bankruptcy relieves a debtor from all pre-petition

debt, and [11 U.S.C.] § 524(a) permanently enjoins creditor actions to collect

discharged debts."  In re Kalikow, 602 F.3d 82, 94 (2d Cir. 2010).  The Code defines

a "creditor" as an "entity that has a claim against the debtor that arose at the time

of or before the order for relief concerning the debtor."  11 U.S.C. § 101(10)(A).  A

confirmation order of a Chapter 11 reorganization plan discharges the debtor from

all pre-confirmation claims.  In re Kalikow, 602 F.3d at 94 (citing 11 U.S.C. §

1141(d)(1)(A)).  Section 524(a)(2) provides that a discharge "'operates as an

injunction against . . . an act to collect, recover or offset any such debt as a personal

liability of the debtor, whether or not discharge of such debt is waived.'"  Id.

(quoting 11 U.S.C. § 524(a)(2)).  A discharge injunction does not, however, affect the

liability of any entity other than the debtor.  11 U.S.C. § 524(e); Green v. Walsh, 956

F.2d 30, 33 (2d Cir. 1992).

While confirmation of a bankruptcy plan does not by itself release any claims

against any non-debtor, bankruptcy jurisdiction encompasses certain claims against

non-debtors.  Whether bankruptcy jurisdiction exists over a non-debtor's claim is

determined by "whether its outcome might have any 'conceivable effect' on the

---

to clarify that "any claims that the Avoca Plaintiffs may have against Tronox have been discharged,
and the Avoca Plaintiffs should dismiss their claims against Tronox . . . immediately." (Tronox Br. at
4.)  The Avoca Plaintiffs vigorously contested the facts asserted in the Tronox brief in a January 27,
2016 letter.  (ECF No. 66.)  (New) Kerr-McGee Corp. filed a response to the Avoca Plaintiffs' letter on
January 28, 2016.  (ECF No. 68.)  The Avoca Plaintiffs filed a response to that letter on January 29,
2016.  (ECF No. 70.)  This decision grants the Tronox debtors the relief that they seek.  The PA State
Action is over.

bankruptcy estate."  Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC) ("Madoff"), 740 F.3d 81, 88 (2d Cir. 2014) (alterations omitted).[13]  The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "Such interests include causes of action possessed by the debtor at the time of filing, and any interest in property that the trustee recovers under specified Bankruptcy Code provisions."  Madoff, 740 F.3d at 88 (alterations, quotation marks and citations omitted).  "Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of the bankruptcy estate."  Id. (quotation marks and alterations omitted).  The Court here has bankruptcy jurisdiction, as the issue raised goes directly to establishing additional liability of the debtors and/or seeking to increase assets available to creditors by seeking to pierce the veil between debtors and the movant herein.

B.   Derivative vs. Individual Creditor Claims

On this motion, the parties have expended a fair amount of effort arguing whether the claims alleged in the PA State Action against the movant herein are derivative claims.  As set forth above, if the claims are properly characterized as such, they are covered by the Injunction in the Settlement Agreement.  The law regarding what constitutes a "derivative" claim is instructive.  "A claim based on rights 'derivative' of, or 'derived' from, the debtor's typically involves property of the

---

[13] Although this Court's Article III power exceeds the authority of a bankruptcy court, see Stern v. Marshall, 131 S.Ct. 2594 (2011), because the Court's jurisdiction to enter the Injunction was predicated on 28 U.S.C. § 1334, the Court believes—and the parties do not argue otherwise—that the scope of the Injunction should be interpreted no broader than would be consistent with the limits of bankruptcy jurisdiction as established by Second Circuit precedent.

estate." <u>Id.</u>  In the bankruptcy context, "derivative claims" are those that "arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy." <u>Id.</u> at 89; <u>see also</u> <u>Koch Ref. v. Farmers Union Cent. Exch., Inc.</u>, 831 F.2d 1339, 1349 (7th Cir. 1987) ("If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim.").  To determine if a claim is derivative, the court must "inquire into the factual origins of the injury and . . . into the nature of the legal claims asserted." <u>Madoff</u>, 740 F.3d at 89; <u>see</u> <u>Johns-Manville Corp. v. Chubb Indem. Ins. Co.</u> ("<u>Manville III</u>"), 517 F.3d 52, 67 (2d Cir. 2008), <u>rev'd and remanded sub nom. on other grounds</u> <u>Travelers Indem. Co. v. Bailey</u>, 557 U.S. 137 (2009).  A court must not rely on the labels that a plaintiff attaches to its complaint, as a plaintiff may not plead around a bankruptcy.  <u>Madoff</u>, 740 F.3d at 91-92.  Claims which seek to increase the size of the bankruptcy estate—the bucket of assets from which creditors may seek recovery—are classic derivative claims.  <u>See</u> <u>In re Quigley, Inc.</u>, 676 F.3d 45, 56 (2d Cir. 2012) (stating that "the derivative/non-derivative inquiry [is] a means to assess whether the suits at issue would affect the bankruptcy estate").

In contrast to a derivative claim, over which a bankruptcy court has jurisdiction, "a bankruptcy court generally has limited authority to approve releases of a non-debtor's independent claims." <u>Madoff</u>, 740 F.3d at 88.  "'[W]hen creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing

so.'" Id. (quoting Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995)); see also Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC) ("JPMorgan"), 721 F.3d 54, 67 (2d Cir. 2013) ("Nowhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of creditors." (quotation marks and alterations omitted)); Steinberg v. Buczynski, 40 F.3d 890, 893 (7th Cir. 1994) ("When a third party has injured not the bankrupt corporation itself but a creditor of that corporation, the trustee in bankruptcy cannot bring suit against the third party."). "While a derivative injury is based upon 'a secondary effect from harm done to [the debtor],' an injury is said to be 'particularized' when it can be 'directly traced to [the third party's] conduct.'" Madoff, 740 F.3d at 89 (quoting St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 704 (2d Cir. 1989)); see also Fox v. Picard, 531 B.R. 345, 349 (S.D.N.Y. 2015).

As the Court discusses "derivative" claims below, it has in mind both the particular nature of the claims that the Avoca Plaintiffs seek to pursue and the result they seek to achieve with respect to the movant herein. As described above, the Avoca Plaintiffs' claims against non-debtor (new) Kerr-McGee Corp. are based on theories of alter ego, veil piercing, and respondeat superior. Such claims require a liability determination against the Tronox debtors combined with an inability or unwillingness for those debtors to meet their obligations, or, at least, a direct connection between the liability of the debtor and non-debtor former parent. The effect of such claims is to make the ultimate parent responsible to pay what is owed

by its affiliate.  Put differently, the Avoca Plaintiffs seek to obtain recovery from the non-debtor former parent to increase the bucket of assets from which they would seek to recover for injuries caused directly by the debtor(s).

In determining whether the Avoca Plaintiffs' claims against (new) Kerr-McGee Corp. constitute derivative claims, this Court is guided principally by three recent Second Circuit decisions, Manville III, JPMorgan, and Madoff.  In each, the Court of Appeals confronted questions regarding the extent to which third-party claims against a non-debtor could properly be enjoined consistent with a bankruptcy court's jurisdiction and the extent to which a debtor has the authority to pursue claims on behalf of its creditors.

Manville III arose out of the bankruptcy of Johns-Manville Corp., the largest manufacturer of asbestos-containing products and the largest supplier of raw asbestos in the United States from the 1920s until the 1970s.  517 F.3d at 55-56.  Pursuant to the confirmation of Johns-Manville's bankruptcy plan, the bankruptcy court entered an injunction prohibiting all persons from commencing any action against any of the debtor's insurance companies that had settled the Johns-Manville estate's insurance policy claims against them.  Id. at 57.  Despite the injunction, asbestos victims subsequently sought recovery against Travelers Insurance, one of Johns-Manville's insurers, alleging that Travelers itself engaged in misconduct by influencing Johns-Manville's purported failure to disclose its knowledge of asbestos hazards, breaching an independent duty owed to the plaintiffs.  Id. at 57-58.  The Second Circuit concluded that the plaintiffs' claims

against Travelers <u>could</u> proceed and that the bankruptcy court had no jurisdiction to enjoin their claims because plaintiffs sought to recover directly from the insurer <u>for its own independent wrongdoing</u>, the plaintiffs made no claim against an asset of the bankruptcy estate, and <u>their actions did not affect the estate</u>. <u>Id.</u> at 65, 68.

In <u>JPMorgan</u>, the Second Circuit was faced with the question of whether the SIPA liquidation trustee for the estate of Bernard L. Madoff Investment Securities LLC ("BLMIS") had standing to bring claims against various financial institutions to recover BLMIS customer property for aiding and abetting Madoff's fraud by providing financial services while ignoring obvious warning signs of the fraud. <u>See</u> 721 F.3d at 64-66. The Court again concluded that such claims were not derivative because they were asserted "on behalf of thousands of customers against third-party financial institutions for their independent handling of individual investments made on various dates in varying amounts." <u>Id.</u> at 71. The claims therefore belonged to those individual customers.

In <u>Madoff</u>, a more recent case combining aspects of <u>Manville III</u> and <u>JPMorgan</u>, the Second Circuit considered whether a creditor's claims against a non-debtor were properly barred as derivative of earlier claims asserted and settled by the BLMIS trustee. There, while settlement talks regarding an adversary proceeding alleging fraudulent transfer, avoidable preferences, and turnover that the trustee asserted against the estate of Jeffrey Picower (one of Madoff's alleged co-conspirators) and related defendants were ongoing, BLMIS customers filed a putative class action against the Picower defendants in the Southern District of

Florida alleging claims for, <u>inter alia</u>, civil conspiracy and conversion.  <u>Madoff</u>, 740

F.3d at 85.  The trustee and the Picower defendants subsequently settled the

adversary proceeding, pursuant to which the bankruptcy court issued a permanent

injunction that barred any BLMIS customer or creditor from asserting any claim

against the Picower defendants "duplicative or derivative of the claims brought by

the Trustee, or which could have been brought by the Trustee." <u>Id.</u> at 86-87.  In

contrast to the result in <u>Manville III</u>, the Second Circuit in <u>Madoff</u> ruled that

although the plaintiffs alleged different causes of action than the trustee, the

injunction nevertheless barred their claims.  <u>Id.</u> at 91.  The Court reasoned that the

plaintiffs' claims derived from the estate because they <u>did not allege that the</u>

<u>Picower defendants took any particularized actions aimed at BLMIS customers</u>

(such as making misrepresentations to them).  <u>Id.</u> at 93.  The Court did, however,

allow plaintiffs leave to amend their complaints as there was "conceivably some

particularized conspiracy claim [that plaintiffs] could assert that would not be

asserted by the Trustee," a question that the Court left to the Southern District of

Florida in the first instance.  <u>Id.</u> at 94.

Taken together, <u>Manville III</u>, <u>JPMorgan</u>, and <u>Madoff</u> stand for several

propositions.  First, that a claim belongs to the trustee—and not to individual

creditors—either when the claim alleges harm to the debtor itself or when the harm

alleged was generalized to all creditors of the debtor (e.g. a harm caused <u>by</u> the

debtor), such that any liability for its acts is directly related to the bankrupt estate.

Second, that the particularized nature of the harm caused by the debtor is not

dispositive—the nature of harms can be different for any type of action.  The core issue is, instead, whether creditors are impacted similarly.  The classic case in which that would be so is when a fraudulent conveyance or undercapitalization has had a common impact on the debtor's creditors by rendering the debtor unable to satisfy its debts.  That action—to recover for the harm to the debtor caused by leaving it with fewer assets to meet its obligations to creditors—is an action properly pursued by the debtor's trustee, rather than individual creditors, to allow for an efficient and orderly proceeding to resolve that issue once and for all.  These cases also teach that a claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole in their efforts to satisfy their claims against the debtor.  In other words, if the action by the trustee would not and <u>could</u> not have resolved the creditors' claims, the claim is individualized.  By the same token, where (for instance) a larger recovery on the very claim pursued by the trustee (as, here, with the Adversary Proceeding) would have led to a larger recovery by the creditor, that is certainly a strong indication that the claim is shared and derivative.

In addition, the nature of the claim is relevant to this question; some claims may be pursued only by one entity and not another.  Who has standing to pursue a claim is a question of state law.  <u>JPMorgan</u>, 721 F.3d at 63 n.10; <u>Kalb, Voorhis & Co. v. Am. Fin. Corp.</u>, 8 F.3d 130, 132 (2d Cir. 1993) (citing <u>St. Paul Fire</u>, 884 F.2d at 700).  For instance, "[i]f under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, that claim constitutes property of

the bankrupt estate and can only be asserted by the trustee or the debtor-in-possession." Kalb, Voorhis & Co., 8 F.3d at 132; see also Maney v. Fischer, No. 96 CIV. 0561 (KMW), 1998 WL 151023, at *2 (S.D.N.Y. Mar. 31, 1998) ("Where plaintiffs are harmed because of the injury the alter ego does to the controlled corporation, the alter ego claim belongs to the bankruptcy estate."). Courts have held that state law causes of action for successor liability and veil-piercing are properly characterized as property of the bankruptcy estate. In re Emoral, Inc., 740 F.3d 875, 880 (3d Cir. 2014) (applying New York or New Jersey law).

As discussed below, successful pursuit of the Avoca Plaintiffs claims requires an initial finding of tort liability (which the Court puts to the side for the moment) and two predicate veil piercings (or, two predicate findings of alter-ego or respondeat superior liability). To succeed, the Avoca Plaintiffs must first demonstrate that one Tronox debtor (Tronox LLC, the former operator of the Avoca Plant) was merely the alter ego of another (Tronox Worldwide LLC, the former direct parent of the plant operator). To resolve the motion before it, this Court must determine whether this claim is held by the estate or not. The same question is repeated with regard to the second veil piercing (or alter ego or respondeat superior finding) necessary to any recovery by the Avoca Plaintiffs: to prevail, after having succeeded in piercing the veil between the two debtor entities, the Avoca Plaintiffs must then pierce the veil between the former direct parent (a Tronox debtor) and

the non-debtor ultimate parent, (new) Kerr-McGee Corp.  The Court discusses

below why these state law claims are owned by the Tronox estate.[14]

    C.    <u>Alter Ego / Veil Piercing Theories of Liability</u>

      "Delaware law permits a court to pierce the corporate veil of a company

where there is fraud or where it is in fact a mere instrumentality or alter ego of its

owner."  <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1457 (2d Cir. 1995) (quotation marks

and alterations omitted).  Veil piercing "may be done only in the interest of justice,

when such matters as fraud, contravention of law or contract, public wrong, or

where equitable consideration among members of the corporation require it, are

involved."  <u>Pauley Petroleum Inc. v. Cont'l Oil Co.</u>, 239 A.2d 629, 633 (Del. 1968);

<u>accord</u> <u>PSG Poker, LLC v. DeRosa-Grund</u>, No. 06 CIV. 1104 (DLC), 2008 WL

---

[14] The parties dispute which state's law governs here.  (New) Kerr-McGee Corp. contends that Delaware law applies because it and the Tronox entities were Delaware corporations or organized under the laws of Delaware; the Avoca Plaintiffs, citing no authority, counter that Pennsylvania's choice of law principles dictate that Pennsylvania law applies.  (New) Kerr-McGee Corp. is correct. Because the underlying PA State Action is proceeding in Pennsylvania state court, Pennsylvania choice of law rules apply.  Under Pennsylvania choice of law rules, Delaware law applies to a claim relating to the internal affairs of a corporation, such as an assertion of alter ego or veil piercing liability.  15 Pa.C.S.A. § 4145(a) ("[T]he court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which the foreign domiciliary corporation was incorporated."); <u>see</u> <u>In re Estate of Hall</u>, 731 A.2d 617, 622 (Pa. Super. Ct. 1999); <u>see also</u> <u>In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.</u>, No. 03 MDL 1529 JMF, 2013 WL 6838899, at *4 n.3 (S.D.N.Y. Dec. 27, 2013).  "[U]nder Delaware law, a trustee possesses standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim."  <u>In re Alper Holdings USA, Inc.</u>, 398 B.R. 736, 759 (S.D.N.Y. 2008); <u>see also</u> <u>Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)</u>, 321 B.R. 128, 137 (Bankr. D. Del. 2005).

      Nevertheless, the "test for piercing the corporate veil is similar under both Pennsylvania and Delaware law."  <u>Advanced Tel. Sys., Inc. v. Com-Net Professional Mobile Radio, LLC</u>, 846 A.2d 1264, 1278 (Pa. Super. 2004).  For purposes of the Court's analysis as to what the Avoca Plaintiffs would have to do to establish their alter ego / veil piercing theories of liability, the result would be no different if the Court applied Pennsylvania law.  The Court does not believe, furthermore, that the outcome of the analysis would change if Pennsylvania law, rather than Delaware law, applied to the question of whether the trustee could assert a veil piercing claim on behalf of the debtor.  <u>See</u> <u>In re Jamuna Real Estate LLC</u>, 365 B.R. 540, 562-63 (Bankr. E.D. Pa. 2007) (finding that trustees could assert alter ego and veil piercing theories against affiliates and owners in accordance with Pennsylvania law).

190055, at *10 (S.D.N.Y. Jan. 22, 2008).  Delaware courts allow the corporate form

to be disregarded, and the corporate veil to be pierced, only in exceptional

circumstances.  E.g., eCommerce Indus., Inc. v. MWA Intelligence, Inc., No. CV

7471-VCP, 2013 WL 5621678, at *27 (Del. Ch. Sept. 30, 2013); see Paradigm

BioDevices, Inc. v. Centinel Spine, Inc., No. 11 CIV. 3489 JMF, 2013 WL 1830416,

at *2 (S.D.N.Y. May 1, 2013).  "The terms 'alter ego theory' and 'piercing the

corporate veil' are used interchangeably in Delaware law."  Winner Acceptance

Corp. v. Return on Capital Corp., No. CIV.A. 3088-VP, 2008 WL 5352063, at *5 n.32

(Del. Ch. Dec. 23, 2008).

Delaware courts look to several factors to determine whether to pierce the

corporate veil, including: "whether the corporation was adequately capitalized for

the corporate undertaking; whether the corporation was solvent; whether dividends

were paid, corporate records kept, officers and directors functioned properly, and

other corporate formalities were observed; whether the dominant shareholder

siphoned corporate funds; and whether, in general, the corporation simply

functioned as a facade for the dominant shareholder."  Mason v. Network of

Wilmington, Inc., No. CIV.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1,

2005); see Kertesz v. Korn, 698 F.3d 89, 91 (2d Cir. 2012) (applying Delaware law

and stating that alter ego claim "turns on the facts of the owner's operation of the

corporation and its relationship to the alleged victim").

Under Delaware law, veil piercing is a doctrine of equity.  Sonne v. Sacks,

314 A.2d 194, 197 (Del. 1973) (holding that piercing the corporate veil could only be

done in the Court of Chancery); see Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical, France, No. 19760-NC, 2004 WL 5366102, at *2 (Del. Ch. Mar. 4, 2004) (stating that it is "not necessarily clear under Delaware law whether veil piercing is an equitable right or an equitable remedy").  Veil piercing has been described as a form of "derivative liability." United States v. Bestfoods, 524 U.S. 51, 65 (1998); cf. PSG Poker, 2008 WL 190055, at *10 ("[I]t has been recognized that the fraud, injustice, or unfairness supporting a claim under this prong of the alter ego analysis must be distinct from the allegations of the underlying cause of action." (citing Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989)).  Veil piercing is thus not a purely independent cause of action.  Instead, piercing the corporate veil effectively amounts to the imposition of joint and several liability between a direct actor and its corporate affiliate for some underlying wrong committed by the direct actor.  Cf. Matter of Seagroatt Floral Co., 78 N.Y.2d 439, 450 (1991) (suggesting that imposition of joint and several liability on two closely-held corporations effectively amounted to piercing corporate veil).

Together, these principles require an initial determination of liability against the Avoca Plant's operator in an amount certain, and a subsequent litigated determination of the availability of theories of alter ego, veil piercing or respondeat superior against its debtor parent.  All of this is required before the Avoca Plaintiffs even reach the non-debtor entity, (new) Kerr-McGee Corp.  The non-debtor's parent's liability is entirely secondary to the liability of the debtor entities.  These principles set the stage for the discussion below.

36

III.   DISCUSSION

To resolve (new) Kerr-McGee Corp.'s motion to enforce the Injunction, the Court must undertake a multi-step analysis.  First, the Court identifies the claims that the Avoca Plaintiffs seek to pursue in the Pennsylvania Court.  To do so, the Court must determine the slice of claims and/or theories that the Avoca Plaintiffs now assert in light of the events that have occurred since they filed the Master Complaint (i.e. the Tronox bankruptcy and the settlement reached in the Adversary Proceeding).[15]

As discussed below, even if the Avoca Plaintiffs' claims were cognizable as a matter of law (a question which the Court determines against the Avoca Plaintiffs), the Injunction bars any such claim.

A.     The Avoca Plaintiffs' Remaining Claims

1.     Overview of Claims

As discussed above, the Avoca Plaintiffs allege that the operations at the Avoca Plant from 1956 through 1996 resulted in the intentional, negligent and otherwise tortious release of several dangerous chemicals, which caused them a variety of harms.  (Master Complaint ¶¶ 2-3.)  They allege claims against four defendant-entities relevant to the pending motion: (1) Kerr-McGee Chemical, LLC (which became Tronox LLC), (2) Kerr-McGee Operating Corp. (which became

---

[15] At oral argument, the Avoca Plaintiffs' counsel repeatedly represented to this Court that the Avoca Plaintiffs were not seeking to pursue any claims against any Tronox debtor.  (Arg. Tr. at 5:9-10, 6:21-22. 53:4-7, 54:5-6, 62:15-16, 64:17-22.)  As noted above, according to a brief submitted on January 26, 2016 by Tronox LLC and Tronox Worldwide Pty. Ltd. (formerly known as Tronox Worldwide LLC), the Avoca Plaintiffs have refused to sign a stipulation of dismissal as to the Tronox debtors in the PA State Action.  (ECF No. 64.)  The Avoca Plaintiffs vigorously dispute the Tronox debtors' position. (ECF No. 66.)

Tronox Worldwide LLC), (3) Kerr-McGee Holdco (which became (new) Kerr-McGee Corp.), and (4) (new) Kerr-McGee Corp.  As discussed above, the Master Complaint at times uses the generic term "Kerr-McGee" to refer to several different entities that the Avoca Plaintiffs allege took various actions that caused them harm.  (See Master Complaint ¶ 25.)

The Master Complaint broadly alleges three theories of liability relating to the entity it calls "Kerr-McGee Corp."  First, the Avoca Plaintiffs allege that "Kerr-McGee Corp." is liable under an alter ego or veil piercing theory on the ground that Kerr-McGee Chemical Corp. (i.e. the owner and operator of the Avoca Plant) was a corporate shell and/or alter ego of "Kerr-McGee Corp." such that they misused corporate forms and constituted a single economic entity.  (Master Complaint ¶ 19.) Second, the Avoca Plaintiffs allege that "Kerr-McGee Corp." is vicariously liable under the doctrine of respondeat superior on the ground that Kerr-McGee Chemical Corp. acted as "Kerr-McGee Corp.'s" agent.  (Master Complaint ¶ 20.)  Third, the Avoca Plaintiffs allege that "Kerr-McGee Corp." itself engaged in conduct relating to the Avoca Plant that makes it directly liable for their injuries.  (Master Complaint ¶ 21.)  Specifically, they allege that "Kerr-McGee Corp." "provided environmental policies, legal counsel, hydrological services and laboratory technical services in connection with the operation of the wood treatment plant" and that "Kerr-McGee Corp." controlled and directed the Avoca Plant's environmental policies and managerial decisions as to emission controls, regulatory compliance issues, regulatory reporting and toxic waste handling.  (Master Complaint ¶ 21.)

While the Avoca Plaintiffs' motion to restore before the Pennsylvania Court did not identify which, if any, portions of the theories included in the Master Complaint they now abandon,[16] they have subsequently made concessions before this Court that narrow the scope of the claims and/or theories they seek to pursue. In their opposition and sur-reply briefs, and particularly at oral argument, the Avoca Plaintiffs conceded that their remaining claims are narrower than a facial review of the Master Complaint—which was filed over ten years ago and prior to a substantial amount of litigation—suggests.

The Avoca Plaintiffs concede that (new) Kerr-McGee Corp. is the only defendant against whom they continue to pursue claims.  (Arg. Tr. at 6:21-22.)[17] They concede that any claims against Tronox were discharged by the Bankruptcy Court's confirmation of the Plan.  (See Arg. Tr. at 5:9-10, 53:4-8, 64:17-22.)  The Avoca Plaintiffs also concede that Tronox LLC is the entity that succeeded the operator of the Avoca Plant, and that Tronox Worldwide LLC is the successor to the parent of that entity.  (See Arg. Tr. at 59:7-16.)  The Avoca Plaintiffs concede that (new) Kerr-McGee Corp. (and its predecessor, Kerr-McGee Holdco, Inc.) did not come into existence until 2001, five years after the Avoca Plant ceased operations.

---

[16] The Avoca Motion's recitation of the history of the litigation suggest that, at least at the time that motion was filed, the Avoca Plaintiffs sought to hold (new) Kerr-McGee Corp. liable based on a theory of fraudulent restructuring and failure to follow corporate formalities with respect to Tronox. (See, e.g., Avoca Motion ¶¶ 40-41, 51.)  As discussed above, at oral argument, the Court observed that "the motion to restore is written as if somebody thinks they can go back after Tronox, LLC and Tronox Worldwide."  (Arg. Tr. at 7:16-18.)  The Court has previously identified its concerns as to this discrepancy.

[17] Although, at least as a technical matter, the Avoca Plaintiffs have not conceded their claims against Kerr-McGee Holdco, they do not dispute that Kerr-McGee Holdco, Inc. was renamed Kerr-McGee Corporation in 2001 (Master Complaint ¶ 18), and as such currently has no existence independent of (new) Kerr-McGee Corp.

(Arg. Tr. at 19:19-23, 59:9-16; see also Master Complaint ¶¶ 17-18.)  Finally, the Avoca Plaintiffs concede that to the extent the Master Complaint alleges that (new) Kerr-McGee Corp. is liable for harm done to the Tronox estate, such claims fall within the scope of the Injunction.  (See Arg. Tr. 49:1-11.)

Along with making the above concessions, the Avoca Plaintiffs have, as explained below, modified their theories as to how (new) Kerr-McGee Corp. may be held liable despite the Injunction.  The Court must therefore identify exactly what theories of liability the Avoca Plaintiffs continue to pursue.  This task is not entirely straightforward; the Avoca Plaintiffs' position as to which slices of their claims remain has been a moving target, as they have revised their theories at each opportunity.  Although oral argument helped clarify their most recent position, the Avoca Plaintiffs did not clearly articulate which, if any, of the potential bases for holding (new) Kerr-McGee Corp. liable they agree are no longer tenable as a result of the release obtained as part of Tronox's bankruptcy.  To cover all bases, the Court identifies each of the theories that the Avoca Plaintiffs have advanced in opposing the pending motion, and then explains why none may proceed.

First, in the Avoca Plaintiffs' opposition brief filed in this Court, they described their remaining claim as alleging that (new) Kerr-McGee Corp. injured them directly through the imposition of, and acquiescence in, unconscionable environmental policies at the Avoca Plant.  (Avoca Pls.' Opp. Br. at 11.)  Following (new) Kerr-McGee Corp.'s response as to why that theory was flawed,[18] in their sur-

---

[18] In its reply, (new) Kerr-McGee Corp. pointed out that to the extent the Avoca Plaintiffs' claims are predicated on its having taken actions involving the Avoca Plant, such claims are, as pled, not viable

reply brief the Avoca Plaintiffs next asserted that they seek to hold movant (new) Kerr-McGee Corp. liable for the particularized and direct conduct of (old) Kerr-McGee Corp. based on a veil piercing theory.  (Avoca Pls.' Sur-reply Br. at 2-3, ECF No. 56.)  They argued that the veil piercing claim falls outside the scope of the Injunction because such a claim was not asserted in the Adversary Proceeding and does not involve allegations of harm to Tronox.  Finally, at oral argument, the Avoca Plaintiffs again shifted their focus by—at times inconsistently—asserting that (new) Kerr-McGee Corp. is liable for its own direct and particularized conduct, as well as for the conduct of the debtors based on theories of "veil piercing" or "reverse veil piercing."  (E.g., Arg. Tr. at 50:4-7, 54:1-4, 55:20-23, 59:18-21.)  Thus, at various points during oral argument, and in their written submissions, the Avoca Plaintiffs advanced both direct and indirect theories of liability.  The Court addresses these two forms of liability in turn.

2.  Direct Liability

To the extent that the Avoca Plaintiffs argue that they may pursue direct claims against (new) Kerr-McGee Corp., it is clear that such claims have not been plausibly pled.  Indeed, at oral argument, the Avoca Plaintiffs' counsel gave no indication that any additional facts indicated (new) Kerr-McGee Corp.'s direct involvement.  (See Arg. Tr. at 55:20-56:20.)  The causes of action in the Master

---

because (new) Kerr-McGee Corp. did not come into existence until 2001, five years after the Avoca Plant ceased operations.  (Kerr McGee Corp.'s Reply Br. at 4, ECF No. 47.)  (New) Kerr-McGee Corp. argued that the Avoca Plaintiffs conflated the different corporate identities of it and (old) Kerr-McGee Corp., the predecessor of Tronox Worldwide LLC and the parent of the operator of the Avoca Plant.  The Court suspects that this argument led the Avoca Plaintiffs to subsequently modify their position.

Complaint asserted as to all defendants include, <u>inter alia</u>, assault, battery, negligence, trespass, nuisance and other similar claims.  (<u>See</u> Master Complaint.) The factual allegations supporting those claims include, <u>inter alia</u>, that "Kerr-McGee Corp." exerted direct parental control of policies and decision-making that harmed the Avoca Plaintiffs.  (Master Complaint ¶ 21.)  But, at oral argument, the Avoca Plaintiffs conceded that this reference to "Kerr-McGee Corp." could not have meant (new) Kerr-McGee Corp., as (new) Kerr-McGee Corp. did not come into existence until 2001, whereas the Avoca Plant ceased operations in 1996.  (Arg. Tr. at 59:9-16, 62:17-63:1; <u>see</u> Court Ex. 1.)  The Avoca Plaintiffs admit that the last acts relating to the Avoca Plant that could have caused their injuries occurred at least five years before (new) Kerr-McGee Corp. came into existence.  In this regard, they conceded that the chart used by (new) Kerr-McGee Corp. at oral argument (which the Court has incorporated into this decision) setting forth such history is accurate.  (<u>See</u> Arg. Tr. at 59:9-16.)

Having made these admissions, there is no conceivable basis upon which the Avoca Plaintiffs can proceed on a theory of direct liability against (new) Kerr-McGee Corp.  (New) Kerr-McGee Corp. could simply not have directly implemented or acquiesced in policies relating to the operation of a wood treatment plant that ceased operations years before it came into existence.  General statements by the Avoca Plaintiffs, in which they refer to evidence that "Kerr-McGee Corp." engaged in particularized conduct relating to the operations of the Avoca Plant, cannot refer to conduct engaged in by the movant herein, (new) Kerr-McGee Corp.  (<u>See</u> Avoca

Pls.' Opp. Br. at 13-16; Arg. Tr. at 20:17-20 ((New) Kerr-McGee Corp.'s counsel stating, "[W]hen [Kerr-McGee Corporation] shows up in the master complaint it means one thing.  When we talk about it, it means another.  Therein lies the confusion."); Arg. Tr. at 24:7-12 ((New) Kerr-McGee Corp.'s counsel stating, "The rub is that whatever policies were drafted, reviewed, approved, managed, supervised could not have happened by this entity because it didn't exist when this was going on.  And that's the fundamental disconnect between their own allegations and whether or not they can bring a complaint in Luzerne County.").)  The Avoca Plaintiffs instead must be referring to (old) Kerr-McGee Corporation, which ultimately became debtor Tronox Worldwide LLC.

### 3.   Indirect Liability

The Avoca Plaintiffs attempt to sidestep the obvious infirmities of their direct liability theory by arguing that the concepts of indirect liability—specifically, theories of "alter ego," "veil piercing" and "respondeat superior"—nonetheless remain.  This reasoning is flawed.  Fundamental to establishing indirect liability under the Avoca Plaintiffs' theories is the predicate establishment of direct liability against the Tronox debtors.  This they cannot do.

Based on the facts included in the background section of the Avoca Plaintiffs' motion to restore jurisdiction to the Pennsylvania Court, the Avoca Plaintiffs seek to avoid the scope of the Injunction by relying significantly on Judge Gropper's findings in the Adversary Proceeding relating to (new) Kerr-McGee Corp.'s failure to adhere to corporate formalities and the intermingling of corporate affairs.  (See Avoca Motion ¶¶ 58-59; Arg. Tr. at 31:13-16 ((New) Kerr-McGee Corp.'s counsel

stating, "[The Avoca Plaintiffs] basically told Judge Amesbury in Luzerne County that they could prove their state case against Kerr-McGee Corp. using Judge Gropper's findings in the adversary proceeding.").)  Essentially, they contend that Judge Gropper's findings render it unnecessary for the Tronox debtors to participate in any further litigation, meaning that pursuit of their claims would not violate the release of claims against the debtors.  The Avoca Plaintiffs confirmed this view at oral argument when they agreed that they envisioned that, as a result of existing findings, there would be no need for the Tronox debtors to participate in the PA State Action.  (Arg. Tr. at 52:22-53:14.)

This position, basic to how the Avoca Plaintiffs believe they can pursue their alter ego and veil piercing claims without the need for participation by the Tronox debtors, fundamentally misapprehends the legal effect of Judge Gropper's findings. Put otherwise, the Avoca Plaintiffs argue that they need not involve the Tronox debtors in the PA State Action because there has already been an adjudication that alter ego and/or veil piercing is appropriate against (new) Kerr-McGee Corp.  This is akin to an issue preclusion argument, and is an incorrect statement of the law under the circumstances here.

The doctrine of issue preclusion holds that, subject to certain exceptions, "'when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" B & B Hardware, Inc. v. Hargis Indus., Inc., 135 S.

Ct. 1293, 1303 (2015) (quoting Restatement (Second) of Judgments § 27, p. 250 (1980) (alterations omitted)).  Judge Gropper's findings of liability against Kerr-McGee Corp. in the Adversary Proceeding clearly do not qualify.  First, because the parties settled before Judge Gropper made a damages determination, no final judgment was even entered in the Adversary Proceeding.  Second, the issue of whether Kerr-McGee Corp. was an alter ego of the Tronox debtors was not actually litigated and necessarily determined in the Adversary Proceeding.  Judge Gropper was faced with claims for actual and constructive fraudulent conveyance, In re Tronox, Inc., 503 B.R. at 266, which involve different elements than claims for alter ego and/or veil piercing under Delaware law, compare id. at 277, 291 (stating that key questions for actual and constructive fraudulent conveyance were whether spinoff transactions were made with actual intent to hinder, delay or defraud, and whether reasonably equivalent value was paid and if the result was insolvency or inadequate capitalization) with Mason, 2005 WL 1653954, at *3 (describing relevant factors for veil piercing claim, which focus on maintenance of corporate formalities).  Therefore, to the extent that the Avoca Plaintiffs rest their argument on the idea that the Tronox debtors would be excluded from participation in any further litigation, they are mistaken.

Put in terms of this case, the only basis for asserting an indirect claim against (new) Kerr-McGee Corp. based on one of these theories is as follows.  The Avoca Plaintiffs would have to first make a claim (and eventually establish liability) against the Avoca Plant operating company (a released debtor), and then make a

claim (and establish liability) against (old) Kerr-McGee Corp. (another released debtor) based on its implementation and acquiescence in policies relating to the Avoca Plant.  Finally, the Avoca Plaintiffs would have to show that (new) Kerr-McGee Corp. is the alter ego of the released Tronox debtor entity, or pierce the corporate veil between the two.  Put otherwise, (new) Kerr-McGee Corp. could be liable only by virtue of its relationship to (old) Kerr-McGee Corp., which, as discussed previously, became Tronox Worldwide LLC.[19]  (New) Kerr-McGee highlighted this point at oral argument (see Arg. Tr. at 34:14-25), using the following graphic (Court Ex. 3, ECF No. 61), which quoted from the Avoca Plaintiffs' sur-reply:



---

[19] The Avoca Plaintiffs' argument could also be construed as seeking to "double pierce" the corporate veil, first from the operator of the plant (which became Tronox LLC) to its direct parent (which became Tronox Worldwide LLC), and then to pierce the corporate veil a second time from that entity up to (new) Kerr-McGee Corp.  That theory is not viable for the same reasons as the single-level veil piercing theory described above.

Furthermore, as explained above, the concepts of alter ego and veil piercing are largely remedial and derivative of the liability of another entity—they do not serve as independent causes of action.  These doctrines are most commonly used where a plaintiff is unable to fully satisfy its claim against the direct wrongdoer, whose liability is established.  Here, when the Avoca Plaintiffs settled their claims against the Tronox debtors as part of the confirmation of Tronox's bankruptcy plan (pursuant to which they received a share of the proceeds of the Tort Claims Trust, which in turn received a share of the proceeds of the Anadarko Litigation Trust), their right to pursue further satisfaction for their claims against the Tronox debtors was extinguished.  The Avoca Plaintiffs provided an unambiguous release to the debtors.  Having settled and released their claims against the Tronox debtors, the Avoca Plaintiffs may not now seek to assert claims fundamentally dependent on liability which may not proceed.

> B.    Claims Barred by the Injunction

Even if the Avoca Plaintiffs' claims were not otherwise unavailable as a matter of law, the Injunction separately bars any claim against the movant herein that they seek to assert.  This discussion requires a clear understanding of the scope of claims proscribed by the Injunction.

Terms of an injunction are construed according to the general interpretive principles of contract law.  Mastrovincenzo v. City of New York, 435 F.3d 78, 103 (2d Cir. 2006).  This Court must defer to the plain meaning of the language and the normal usage of the terms selected.  Id.; see also In re Kalikow, 602 F.3d at 94-95. In this regard, the terms of the Settlement Agreement (which contains the

definitions of several of the terms used in the Injunction), must be interpreted in accordance with New York law.  (Settlement Agreement § 13.3.)  Pursuant to New York law, the Court interprets the Settlement Agreement "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000).

The Injunction in the Settlement Agreement bars Tronox's creditors (and their attorneys) from asserting against any "Anadarko Released Party" any "Trust Derivative Claims" or "any claims that are duplicative of "Trust Derivative Claims," whether or not held or controlled by the Anadarko Litigation Trust, or whether or not it could have asserted such claims against any "Anadarko Released Party." Anadarko, 2014 WL 5825308, at *10.[20]

The term "Trust Derivative Claims" was defined in the Settlement Agreement to include any claims that the Anadarko Litigation Trust asserted or could have asserted "seeking relief or recovery arising from harm to any Debtor or any Debtor's estate, based on any legal theory" including claims "arising out of or in any way related to (i) the Adversary Proceeding; (ii) the Chapter 11 Cases; (iii) the Bankruptcy Claims; (iv) the Covered Sites; and/or (v) any [released party's] ownership . . . or other relationship with a Debtor and/or any of its predecessors . . . ."  (Settlement Agreement § 1.82.)  The definition explicitly includes claims for "alter ego," "corporate veil piercing," and "successor liability."  Id.  The key concept

---

[20] The Avoca Plaintiffs do not dispute that they were creditors of Tronox based on the state law claims they filed against the predecessors of Tronox LLC and Tronox Worldwide LLC in the PA State Action.  The Avoca Plaintiffs also do not dispute that (new) Kerr-McGee Corp. qualifies as an "Anadarko Released Party."  (Settlement Agreement § 1.9.)

is that where the action is intended to increase the basket of assets for creditors regarding the Covered Sites, or based on prior ownership of a debtor, the claims asserted in the action are "Trust Derivative Claims."

This is even clearer here as the Injunction at issue arose out of a settlement of the Adversary Proceeding; the purpose of the Injunction is to prevent attempts to pursue claims that were or could have been part of an adversary proceeding by Tronox against (new) Kerr-McGee Corp.  See Fed. R. Bankr. P. 7001 (listing ten categories of adversary proceedings); In re Dynegy, Inc., 770 F.3d 1064, 1069 (2d Cir. 2014) ("An adversary proceeding must fall within one of the ten categories defined in Bankruptcy Rule 7001.").

Finally, while the Injunction does not bar any liability that such released parties "might have that does not arise from or through a liability of a Debtor," Anadarko, 2014 WL 5825308, at *10, that provision does not assist the Avoca Plaintiffs.  Given the Avoca Plaintiffs' theories of indirect liability, this "arise from or through a liability of a Debtor" language is key; only by establishing liability of a debtor (twice) can the Avoca Plaintiffs proceed.

The Avoca Plaintiffs argue that their personal injury claims cannot be "Trust Derivative Claims" covered by the Injunction because the Anadarko Litigation Trust never possessed and could not have asserted their personal claims against a non-released party, (new) Kerr-McGee Corp.  The Avoca Plaintiffs assert that their claims do not arise from any harm to Tronox, but rather to personal injuries they separately suffered.  (Arg. Tr. 63:14-16.)  As support, they assert that "Trust

Derivative Claims" only include claims that arose "from harm <u>to</u> any Debtor or any Debtor's estate" (Settlement Agreement § 1.82 (emphasis added)).  This argument is flawed.  It misunderstands the nature of their indirect claims, and their interpretation of the scope of claims alleging harm to a debtor's estate is unduly narrow.

In certain places in their papers, the Avoca Plaintiffs appear to pursue this argument based on theories of <u>direct</u> liability of (new) Kerr-McGee Corp. to them.  But this is not how their claim is or could be alleged and is not plausible.  Their admissions in this Court alone dispose of any theory of direct liability.  The Master Complaint (which, of course, was drafted without the benefit of the subsequent ten years of litigation and the factual development as to the relevant corporate history that the Court has previously detailed) does allege that "Kerr-McGee Corp." was directly responsible for the Avoca Plaintiffs' personal injuries based on its own conduct, including, in particular, the imposition of, and acquiescence in, unconscionable environmental policies at the Avoca Plant.  (Master Complaint ¶ 21.)  At oral argument, the Avoca Plaintiffs argued at one point that their theory of direct liability is that "the parent is responsible due to negligence in proximately causing personal injury" to the Avoca Plaintiffs; that (new) Kerr-McGee Corp. is "directly responsible for the policies that led to the harm" that the Avoca Plaintiffs suffered; and that the claim survives because "no other creditor . . . is making any claim that arises from any decisions made by Kerr-McGee Corporation having to do with the environmental policies in the Avoca wood treatment plant."  (Arg. Tr. at

50:5-7, 55:20-22, 61:12-15.)  But this mixes the issues of direct claims (which they do not have) with whether their indirect claims can constitute "Trust Derivative Claims" given their personal nature.  These arguments must be separated.

As to direct claims, it is not that no direct claim could be possible.  If the Avoca Plaintiffs had alleged that (new) Kerr-McGee Corp. was directly liable because it instructed its subsidiaries to not clean up the Avoca Plant site, causing further injuries, such a claim would not constitute a Trust Derivative Claim or be duplicative of one.  Therefore, if viable, such a claim would fall outside the scope of the Injunction.  (New) Kerr-McGee Corp. has effectively conceded as much.  (See Arg. Tr. at 41:1-6, 41:19-25, 66:4-12.)  Such allegations would present a claim based on alleged tortious conduct of (new) Kerr-McGee Corp. itself that was directed at the Avoca Plaintiffs, and not at Tronox or its creditors in general.  This is an independent and particularized claim that resembles the claims that belonged to individual creditors in JPMorgan and Manville III.  See JPMorgan, 721 F.3d at 71; Manville III, 517 F.3d at 65, 68.  The harm alleged would have been suffered directly by these plaintiffs and no other creditors of the Tronox estate.

The Avoca Plaintiffs have foreclosed this claim.  They have conceded that there are no facts that would allow such a theory, as (new) Kerr-McGee Corp. could not have directly implemented or acquiesced in policies relating to the operation of a wood treatment plant that ceased operations years before it came into existence, and they have never once proffered a single fact that supports an instruction as to clean up of the Avoca Plant site.

51

Turning to the argument that the personal nature of the claims removes them from any "derivative" category, that argument misunderstands bankruptcy law.  "Trust Derivative Claims," as understood in bankruptcy law, include the universe of claims alleging harm to a <u>debtor's estate</u>; such a universe is broader than claims that a debtor could have brought prior to its entrance into bankruptcy.[21]

The bankruptcy estate includes "[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative." <u>Madoff</u>, 740 F.3d at 88.  It includes not only the causes of action possessed by the debtor at the time it filed for bankruptcy protection, but also property that the trustee may recover on behalf of the estate.  <u>Id.</u>  Most pertinent here, a trustee may recover, on behalf of the creditors of the estate, liabilities that are derived from the debtor that are generalized and common to all creditors.  <u>See</u> <u>Madoff</u>, 740 F.3d at 89, 93; <u>see also</u> <u>Koch Ref.</u>, 831 F.2d at 1349 ("[A] single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner.").  The rationale for conferring on the trustee, to the exclusion of individual

---

[21] This understanding is buttressed by the proceedings and litigation history that led to this Court's entry of the Injunction.  In particular, the Court's view is informed by the nature and scope of the Adversary Proceeding and the Settlement Agreement.  The Adversary Proceeding (and the resulting Settlement Agreement) encompassed any and all claims that the Tronox trustee could pursue against (new) Kerr-McGee Corp.  The Adversary Proceeding was brought by the Tronox estate (and then continued by the Anadarko Litigation Trust) to recover funds transferred to (new) Kerr-McGee Corp. through fraudulent intra-corporate shenanigans.  The Anadarko Litigation Trust Agreement gave the Litigation Trust the power to institute any other actions that could have been brought by Tronox against (new) Kerr-McGee Corp.  (Stephen Scotch-Marmo Decl., Ex. 2, ECF No. 48-2.)  Thus, any claims that could be asserted by the Tronox trustee against the defendants in the Adversary Proceeding may properly fall within the scope of the Settlement Agreement and the Injunction.

creditors, the right to recover for derivative, generalized claims is that only the estate is capable of ensuring equitable distribution of the proceeds, preventing individual creditors from chasing limited assets that should be shared collectively. See In re Coudert Bros. LLP, No. 11-2785 CM, 2012 WL 1267827, at *6 (S.D.N.Y. Apr. 12, 2012) (If individual creditors "can rely on a theory of successor liability to recover from [third parties], then so can every other . . . creditor, and who recovers depends merely on who sues the [third parties] first. This is precisely the sort of result the Bankruptcy Code exists to forestall, by placing exclusive standing over estate claims in the bankruptcy trustee or plan administrator."); see also Koch Ref., 831 F.2d at 1343 ("Historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another." (alterations omitted)).

Inquiry into the factual origins of the Avoca Plaintiffs' indirect liability claims, see Madoff, 740 F.3d at 89-92, shows that these claims are generalized to all Tronox creditors and do not allege individualized harm. The Avoca Plaintiffs' bases for asserting theories of alter ego, veil piercing, or respondeat superior are unrelated to the operations of the Avoca Plant and the personal injuries the Avoca Plaintiffs suffered. The indirect liability allegations are that "Kerr-McGee Corporation", inter alia, "dominated", "had no separate existence from", was a "conduit" of, and had "common boards of directors, officers and employers" with, its subsidiaries. (Master Complaint ¶ 19.) These allegations are generalized to all creditors because they could be equally asserted (if they were not barred by the

release) by any creditor of the Tronox debtor entities whose claim has been left partially unsatisfied by recovery efforts from the Tronox debtors themselves.  In other words, claims based on allegations such as these—a general failure to adhere to corporate formalities and abuse of the corporate form—are equally capable of increasing the basket of assets that could be used to satisfy any and all liabilities owed by the Tronox debtors.  This enlargement of the pool of assets that may be reached to satisfy liabilities for which the Tronox debtors are directly responsible is plainly to the benefit of all of Tronox's creditors in proportion to their claims against the Tronox debtors.  In short, because the Avoca Plaintiffs' theories of indirect liability are generalized to all creditors, they belonged to the Tronox estate and thus fell within the scope of "Trust Derivative Claims" as defined in the Injunction.

        1.    <u>Expectations of the Parties</u>

The Avoca Plaintiffs further argue that their claims must fall outside the scope of the Injunction because barring these claims violates the expectations of the parties to the Settlement Agreement.  The Avoca Plaintiffs reason that the claims they seek to pursue against (new) Kerr-McGee Corp. must have survived the settlement because—through the Tort Claims Trust and its Advisory Committee— they explicitly rejected Anadarko and (new) Kerr-McGee Corp.'s request for a broad release as to them as part of a settlement of the Adversary Proceeding.  (Avoca Pls.' Opp. Br. at 22-23; <u>see also</u> Arg. Tr. at 68:4-11.)  This view is misguided.  A belief that claims are retained is trumped by contractual language that clearly states they are not.  <u>Mastrovincenzo</u>, 435 F.3d at 103 (court must defer to plain terms of injunction).

54

In a similar vein, the Avoca Plaintiffs also argue that their claims must survive because (new) Kerr-McGee Corp. waived its right to contest its responsibility for the policies at the Avoca Plant.  Their argument rests on (new) Kerr-McGee Corp.'s decision not to argue that it was the wrong entity to the Pennsylvania Court despite the several years of litigation that preceded the Tronox bankruptcy.  (Arg. Tr. 50:21-51:8, 64:5-10.)  But the fact that (new) Kerr-McGee Corp. did not seek dismissal of the suit prior to the Tronox bankruptcy—and thus prior to the release of claims against Tronox, and entry of the Settlement Agreement and the Injunction—does not mean that (new) Kerr-McGee Corp. would have proceeded in the same fashion if it were the sole remaining defendant and the only potential claims against it were based on its direct liability.  The Court does not believe, under the circumstances, that anything should be read into (new) Kerr-McGee Corp.'s decision not to advance this argument when the case was very different back in 2009.

### 2.    Prior History as Guide

The Avoca Plaintiffs also argue that their claims are not "Trust Derivative Claims" based on the Bankruptcy Court's decision in Mt. Canaan Full Gospel Church, Inc. v. Kerr-McGee Refining Corp. (In re Tronox, Inc.) ("Mt. Canaan"), Bankruptcy No. 09–10156 (ALG), 2011 WL 482724 (Bankr. S.D.N.Y. Feb. 4, 2011). There, plaintiff Mount Canaan Full Gospel Church brought an action in Alabama state court alleging state law claims relating to the operation of a petrochemical facility owned by an affiliate of (new) Kerr-McGee Corp.  Id. at *1.  The complaint did not name any Tronox entity as a defendant, and no Tronox entity entered the

55

case until one of (new) Kerr-McGee Corp.'s co-defendants filed a cross-claim naming Tronox Inc., its affiliate Triple S Refining Corporation, and (new) Kerr-McGee Corp. as cross-claim defendants.  Id.

The case was automatically stayed when Tronox filed for bankruptcy in January 2009; at that time, (new) Kerr-McGee Corp. filed a notice of removal asserting the existence of bankruptcy jurisdiction and seeking transfer of venue to the Bankruptcy Court.  Id.  In February 2011—prior to the issuance of the Injunction—the Bankruptcy Court granted the plaintiff's motion to remand to state court on the basis that the litigation was not closely related to the Tronox bankruptcy.  Id. at *3.  The Bankruptcy Court reasoned that remand was appropriate because the Adversary Proceeding was "concerned with the corporate transactions that gave rise to the [Tronox] spin-off," whereas the Mt. Canaan suit was based solely on Alabama law (involving claims of negligence, trespass, nuisance and strict liability for contamination) and related only to events and property located in Alabama.  Id. at *1, 3.  The Bankruptcy Court concluded that there was no reason to keep the case, as the plaintiff had released the Tronox debtors from any liability and the cross-claims and potential third-party claims against Tronox had been quantified or liquidated.  Id. at *2-4.  Here, the Avoca Plaintiffs chose to participate in the bankruptcy, and to agree to the settlement in the Adversary Proceeding (notwithstanding their reservations).

The plaintiff in Mt. Canaan was not subject to the Settlement Agreement or the Injunction, nor was it a claimant in Tronox's bankruptcy.  (Kerr McGee Corp.'s

Reply Br. at 10.)  There is, moreover, no indication in Judge Gropper's decision that the plaintiff sought to hold (new) Kerr-McGee Corp. indirectly liable for the conduct of a Tronox debtor, as the Avoca Plaintiffs do here.[22]  Finally, to the extent that any inconsistencies between this Court's decision and Judge Gropper's decision in <u>Mt. Canaan</u>, Judge Gropper's decision, which was not appealed from, is not preclusive of (new) Kerr-McGee Corp.'s motion here.

C.   <u>The Relief</u>

(New) Kerr-McGee Corp. seeks an order requiring the Avoca Plaintiffs to cease litigating the PA State Action against them, and to dismiss it as to the released Tronox debtors.  (Kerr-McGee Corp.'s Opening Br. at 14.)  The Avoca Plaintiffs counter that, as this in part requires a determination as to the viability of the direct claims and the meaning and scope of their indirect claims, (new) Kerr-McGee Corp. is essentially seeking a summary judgment ruling from this Court—a ruling that should be left to the Pennsylvania Court.  (Avoca Pls.' Sur-reply Br. at 5-8.)  In the context here, which involves the enforcement of this Court's own prior orders, and based on the law applicable to such situations, the Avoca Plaintiffs are incorrect.  It is within this Court's discretion and power to enforce the Injunction and, if to do that it is required to order parties to take appropriate actions in that regard, so be it.  This Court also has tremendous interest in preventing litigation the pursuit of which is violative of an injunction previously issued by this Court.

---

[22] In <u>Mt. Canaan</u>, (new) Kerr-McGee Corp. did argue, in opposing remand, that the plaintiff incorrectly named it as the owner of the Alabama facility.  <u>Id.</u> at *2.  There is, however, nothing in Judge Gropper's decision to suggest that the plaintiff pursued theories of indirect liability against (new) Kerr-McGee Corp. similar to those at issue here.

In their sur-reply, the Avoca Plaintiffs ask that, to the extent this Court determines that their claims are barred, they should be allowed an opportunity to seek leave from the Pennsylvania Court to amend their pleadings. (Avoca Pls.' Sur-reply Br. at 5; see also Avoca Pls.' January 27, 2016 Letter at 3, ECF No. 66.) That request is denied.

The Avoca Plaintiffs have already had ample opportunity to work out their theories and present their strongest possible claims. Despite specific questions at oral argument, or in any of the many submissions to this Court on this motion, they have provided no fact that would save their claims. The lack of any such facts distinguishes this case from Madoff, in which the Second Circuit determined that there was "conceivably some particularized conspiracy claim" that the plaintiffs could assert that would not be derivative of claims made by the trustee. Madoff, 740 F.3d at 94. Furthermore, the Court is concerned that the request by the Avoca Plaintiffs is in all events gamesmanship. That view is bolstered by the recent refusal of the Avoca Plaintiffs to dismiss their claims against the Tronox debtors—parties as to whom they have no credible arguments that any claim survives. This position greatly concerns the Court.

IV.   CONCLUSION[23]

For the reasons set forth above, the Court GRANTS Kerr-McGee Corp.'s motion to enforce the Injunction. The Avoca Plaintiffs are hereby ORDERED to dismiss with prejudice their actions filed in the Court of Common Pleas of Luzerne

---

[23] The Court has considered the Avoca Plaintiffs' other arguments, and concludes that they are without merit.

County, Pennsylvania, against Kerr-McGee Corp. within seven days, and to make no attempt to file any actions making similar claims against (new) Kerr-McGee Corp. or any Tronox debtor in any other forum.

The Clerk of Court is directed to close the motion at ECF No. 37.

SO ORDERED.

Dated:      New York, New York
            February 1, 2016

_____
      KATHERINE B. FORREST
   United States District Judge