UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――
IN RE TRONOX INCORPORATED, et al.

TRONOX INCORPORATED, et al.,
                              Plaintiffs,

                -v-

ANADARKO PETROLEUM
CORPORATION, et al.,
                              Defendants.
―――――――――――――――――――――――――――――――

14-CV-5495 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      In 2014, Anadarko Petroleum Corporation and affiliated companies entered into a $5.15 billion environmental and toxic-tort settlement to end an adversary proceeding in bankruptcy court. (*See* Dkt. No. 32.) Critical to that settlement was a permanent injunction (the "Injunction") prohibiting the litigation of claims that are derivative or duplicative of the settled claims. (*See* Dkt. No. 34 ("Inj.").) In 2020, Larry Ashworth filed a complaint in the Western District of Louisiana alleging environmental harm, including claims against Anadarko and Occidental Petroleum Corporations (collectively, "Anadarko"). *See Ashworth v. International Paper Co.*, 2020 WL 4043186 (W.D. La. July 17, 2020). Anadarko now moves before this Court to enforce the Injunction, which it alleges bars Ashworth's claims against it in Louisiana, and asks the Court to hold Ashworth and his counsel in contempt. (Dkt. No. 102.) For the reasons that follow, Anadarko's motion is denied.

**I.    Background**

      The Court assumes familiarity with the pre-2014 factual background of this case from the prior opinion by then-Judge Forrest. (*See* Dkt. No. 32.) After overruling all objections and

1

adopting the Bankruptcy Court's findings of facts and conclusions of law, Judge Forrest approved the Settlement Agreement in its entirety and issued the Injunction.  (*Id*.)  In doing so, this Court and the Bankruptcy Court retained jurisdiction over all disputes relating to the opinion and order, and the parties to the Settlement Agreement were authorized to act to effectuate the Settlement Agreement's terms.  (*Id*.)

> The Injunction, using capitalized terms defined in the Settlement Agreement, mandates:
>
> **(i)** any Debtor(s),
>
> **(ii)** any creditor of any Debtor who filed or could have filed a claim in the Chapter 11 Cases,
>
> **(iii)** any other Person whose claim (A) in any way arises from or is related to the Adversary Proceeding, (B) is a Trust Derivative Claim, or (C) is duplicative of a Trust Derivative Claim, and
>
> **(iv)** any Person acting or purporting to act as an attorney for any of the preceding
>
> is hereby permanently enjoined from asserting against any Anadarko Released Party
>
> **(I)** any Trust Derivative Claims or
>
> **(II)** any claims that are duplicative of Trust Derivative Claims, whether or not held or controlled by the Litigation Trust, or whether or not the Litigation Trust could have asserted such claims against any Anadarko Released Party.

(Inj.)  The Settlement Agreement (Dkt. No. 1-1 ("Agr.")) provides the following definitions:

> "Trust Derivative Claims" are "**any and all claims and/or remedies that are held and/or controlled by, and which were or could have been asserted by, the Litigation Trust against any Anadarko Released Party**, seeking relief or recovery arising from harm to any Debtor or any Debtor's estate, based on any legal theory including, without limitation, such claims and/or remedies under federal or state law, statutory or common law, in equity or otherwise, arising out of or in any way related to (i) the Adversary Proceeding; (ii) the Chapter 11 Cases; (iii) the Bankruptcy Claims; (iv) the Covered Sites; and/or (v) any Anadarko Released Party's ownership, management, operation, status, tenure, conduct, omission, action or inaction at any time as a stockholder, affiliate, owner, partner, member, manager, director, officer, employee, servant, agent, representative, attorney, creditor, successor, assign or other relationship with a

2

> Debtor and/or any of its predecessors, in each case, including, without limitation, such claims and/or remedies that are actions, causes of action, . . . , including Unknown Claims to the maximum extent allowed under the law, whether pled or unpled, fixed or contingent, choate or inchoate, matured or unmatured, foreseen or unforeseen, accrued or unaccrued, past, present or future for fraudulent transfer, fraudulent conveyance, preference, turnover, breach of fiduciary duty, negligence, gross negligence, mismanagement, civil conspiracy, aiding and abetting, unjust enrichment, constructive trust, equitable subordination, equitable disallowance, agency, joint venture, alter ego, corporate veil piercing, usurpation of corporate opportunity, successor liability, breach of contract, fraud, intentional, reckless or negligent misrepresentation, contribution, indemnity, and all other such claims and/or remedies." (Agr. ¶ 1.82 (emphasis added).)
>
> "Unknown Claims" means "any and all claims that the owner of the claim is not aware of or does not suspect to exist for any reason." (Agr. ¶ 1.83.)
>
> "Litigation Trust" refers to the Anadarko Litigation Trust, plaintiff in the underlying proceedings. (Agr. at 1; ¶ 1.49.)

In 2019, Ashworth discovered toxic waste contamination on his property. (Dkt. No. 104-4 ("La. Compl.") ¶ 25.) In early 2020, Ashworth filed suit in the Western District of Louisiana alleging toxic waste contamination from creosote treatment sites located 5.1 miles from his property that were shut down in 1989. (*See* La. Compl.; La. Compl. ¶¶ 10, 20.) Ashworth named both Anadarko Petroleum Company and Occidental Petroleum Company as two of six defendants, alleging they are liable as successors in title to the companies that caused the contamination. (*See* La. Compl.; La. Compl. ¶ 9.)

Shortly thereafter, Anadarko's counsel contacted Ashworth's counsel, explaining their belief that the Injunction barred Ashworth's case and asking him to dismiss the claims against Anadarko. (Dkt. No. 104-5.) Ashworth's counsel disagreed, and they continued to discuss the matter for months. (Dkt. Nos. 104-6, -7, -8.)

In July 2020, Anadarko moved to enforce the Injunction by barring Ashworth's claims against it and to hold Ashworth and his counsel in contempt. (Dkt. No. 102.)

3

## II. Legal Standard

Generally, a federal court has an interest in "orderly, expeditious proceedings.'" *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (quoting *Hutto v. Finney,* 437 U.S. 678, 696, (1978)). Such interest "justifies any reasonable action taken by the court to secure compliance with its orders." *Berger*, 771 F.2d at 1568 (quoting *Gates v. Collier,* 616 F.2d 1268, 1271 (5th Cir. 1980)). Where "a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15 (1971).

## III. Discussion

### A. Motion to Enforce Judgment

#### 1. Whether Ashworth's Claims are Trust Derivative Claims

This motion requires this Court to determine whether the Injunction blocks Ashworth's claims against Anadarko in the Western District of Louisiana. Anadarko argues that Ashworth's Louisiana claims are Trust Derivative Claims or duplicative of such claims and therefore must be dropped. Ashworth, who discovered the contamination in 2019, responds that his claims arose long after resolution of the original bankruptcy petition and, as a result, are not forbidden Trust Derivative Claims that "were or could have been asserted" by the plaintiffs in the underlying lawsuits.[1] (Agr. ¶ 1.82.) This issue turns on when Ashworth's claims arose, legally speaking: Anadarko contends the claims arose when the contamination occurred (Dkt. No. 103 at 22),

---

[1] Ashworth does not dispute that Anadarko is an "Anadarko Released Part[y]" protected by the Injunction.

while Ashworth maintains that his claim could only have been discharged in earlier rulings if he were identifiable to Anadarko before the bankruptcy petition was filed (Dkt. No. 112 at 16).[2]

The analysis begins with the Second Circuit's decision in *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991).  There, determining whether prepetition cleanup costs incurred by the Environmental Protection Agency were "claims" for bankruptcy purposes, the court posed a hypothetical:  A bridgebuilder makes 10,000 bridges estimating one will fail and kill 10 people, then becomes insolvent and files a bankruptcy petition. *Id*. at 1003.  Do those 10 people — currently unidentifiable — have a "claim" that will nonetheless be discharged by the bankruptcy? *Id*.  Such question illustrates the "enormous practical and perhaps constitutional problems" that arise from defining "claim" broadly to include an absolute right to payment for harm arising from a debtor's prepetition conduct. *Id*. at 1003.  "To expect 'claims' to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as 'absurd.'" *Id*. (citing cases).

The *Chateaugay* court ultimately declined to decide "how the definition of 'claim' applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted in detectable injury." *Id*.  Instead, it affirmed the district court's determination that a claim arises from this debtor's "pre-petition releases or threatened releases of hazardous substances," but *not* other actions, "such as the construction of a storage facility." *Id*. at 1005.  Important to the court's holding was the fact that the EPA and the polluter had a relationship "far closer than that existing between future tort claimants totally

---

[2] The parties also dispute whether barring Ashworth's claims constitutes a violation of due process, and whether Ashworth received constitutionally adequate notice.

unaware of injury and a tort-feasor," as the two were "acutely aware" of one another as a regulating agency and company subject to such regulation. *Id*.

In 2016, the Second Circuit examined the related question of whether a "free and clear" sale discharged claims brought against a successor automobile manufacturer for car defects revealed post-bankruptcy. *Elliott v. General Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 143 (2d Cir. 2016) ("*Motors Liquidation I*"). To avoid the "practical and constitutional problems" raised in *Chateaugay*, the *Motors Liquidation I* court held that a claim was discharged by the "free and clear" sale if it (1) "arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim" and (2) there is "some minimum contact" or "relationship" between debtor and claimant "such that the claimant is identifiable." *Id*. at 156.

Applying this test, the Second Circuit held that customers who bought used cars produced by the predecessor manufacturer — but purchased *after* the "free and clear" sale and without knowledge of the defect — did *not* have prepetition claims. *Id*. at 157. This is because, as of the petition, "there were an unknown number of unknown individuals who would one day [buy used cars]" so "[t]here could have been no contact or relationship — actual or presumed — between [the predecessor manufacturer] and these specific plaintiffs." *Id*. The Second Circuit also held that customers who purchased cars from the predecessor manufacturer *before* bankruptcy *did* have dischargeable claims, despite not learning about the defects until after the petition. *Id*. Such customers had claims because they had "come into contact" with the manufacturer before the petition, and their claims arose from the manufacturer's prepetition conduct — even though the customers "did not yet know." *Id*. (citing *Chateaugay*, 944 F.2d at 1005).

6

The parties also rely on several district court cases, including *In re Texaco Inc.*, in which the court held that a prepetition chemical release gave rise to a claim even though the contamination "was not (and still is not) manifest to physical observation on the surface of the land." 182 B.R. 937, 952 (Bankr. S.D.N.Y. 1995). *Chateaugay*, the *Texaco* court explained, held that costs resulting from environmental damage are "indeed claims, dischargeable in bankruptcy, regardless of when such costs were incurred, as long as such costs concerned prepetition release or threatened release of hazardous waste." *Id*. The court distinguished environmental cases from product liability claims: Someone exposed to asbestos does not have a claim because such claim is "not merely unknown" but "incapable of detection" since the potential damage caused by exposure, i.e. mesothelioma, has not yet occurred. *Id*. at 953. By contrast, "all of the physical events giving rise" to *Texaco*'s environmental tort occurred prepetition and were "capable of detection by scientific means," so they gave rise to a claim. *Id*. Notably, although it did not explicitly factor into the court's claim analysis, the *Texaco* claimants and debtor had a decades-long prepetition relationship. 182 B.R. at 941, 954–56.

And in 2015, this Court decided *In re Grumman Olson Industries, Inc*., a product liability case in which pre-bankruptcy conduct caused post-bankruptcy injury. 467 B.R. 694, 696–97 (S.D.N.Y. 2012) (Oetken, J.). This Court approvingly cited the test set forth by *Epstein v. Official Comm. Of Unsecured Creditors (In re Piper Aircraft Corp.)*, which requires pre-bankruptcy events to "create a relationship, such as contact, *exposure*, impact, or privity" between the claimant and the debtor's product for a claim to arise. *Grumman*, 467 B.R. at 705 (citing *Piper Aircraft*, 58 F.3d 1573, 1577 (11th Cir. 1995) (emphasis added)).

Anadarko reads *Chateaugay* to hold that prepetition releases of toxic chemicals give rise to a claim, even if a claimant is unaware of the release. *Chateaugay* and *Texaco*, in its telling,

7

stand for the proposition that a claim arises in the environmental tort context when scientifically detectable contamination occurs. It similarly suggests that this Court read *Motors Liquidation I* and *Grumman* in one of two ways. In its first interpretation, those cases confirm that detectability is "the touchstone of a claim": in *Motors Liquidation I*, prepetition customers had claims despite not having detected the defect, while post-petition customers had no claim since, "by definition," they had nothing to detect. (Dkt. No. 116 at 6.) *Grumman*, similarly, did not involve a detectable injury until after bankruptcy. In Anadarko's second interpretation, the two cases are inapposite due to their product liability context. In other words, Anadarko appears to argue that, in the environmental tort context, the Court should apply a version of the "conduct test," which "looks exclusively to when the acts giving rise to liability occurred" to determine when a claim arose. *In re Johns-Manville Corp.*, 422 B.R. 221, 235 (Bankr. S.D.N.Y. 2016).

Ashworth, on the other hand, maintains that the distinguishing factor in *Motors Liquidation I* was whether the customers had a pre-bankruptcy relationship with the manufacturer. Applying the Second Circuit's *Motors Liquidation I* test to the present case, Ashworth argues that he had no claim because he had no "minimum contact" or "relationship" with Anadarko such that Ashworth was identifiable. 829 F.3d at 156.

The case law, while less than pellucid, is on Ashworth's side. "The Second Circuit has applied both the 'prepetition relationship test' and the 'fair contemplation test' in cases involving environmental claims." *In re Motors Liquidation Company*, 598 B.R. 744, 755 (Bankr. S.D.N.Y. 2019) ("*Motors Liquidation II*").[3] While *Texaco* appears to read a version of the conduct test

---

[3] The fair contemplation test, largely irrelevant in this case, holds that "a contingent obligation is a 'claim' if the occurrence of the contingency or future event that would trigger liability was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *In re Motors Liquidation Co.*, 576 B.R. 761, 771 (Bankr. S.D.N.Y. 2017) (citing *Chateaugay*, 944 F.2d at 1003.)

into *Chateaugay*'s holding, 182 B.R. at 952–53, the court does not acknowledge that the *Chateaugay* court credited "[t]he relationship between environmental regulating agencies and those subject to regulation" as one that "provides sufficient 'contemplation' of contingencies to bring most . . . obligations based on pre-petition conduct within the definition of 'claims.'" 944 F.2d at 1005. *Texaco*, too, featured a longstanding relationship. 182 B.R. at 941, 954–56. Focusing purely on the act of contamination veers towards the "conduct test," which the Second Circuit has never formally adopted and others have criticized as overly broad. *See, e.g.*, *Piper Aircraft*, 58 F.3d at 1577. Ultimately, especially given inherent due process considerations, the Court concludes that the proper test to apply is the prepetition relationship test as articulated in *Motors Liquidation I*.[4]

Thus, for bankruptcy purposes, a claim arises from a debtor's pre-petition conduct that causes post-petition injury if such claim (1) "arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim" and (2) there is "some minimum contact" or "relationship" between debtor and claimant "such that the claimant is identifiable." *Motors Liquidation*, 829 F.3d at 156.

Even applying the *Motors Liquidation I* test, all hope is not lost for Anadarko. In the case law, it is something of an open question whether a toxic chemical exposure, such as the one at issue, suffices to establish a minimum contact or relationship satisfying the test. The widely cited *Piper* test, Anadarko points out, states that a "relationship" may be based on "exposure." *Piper Aircraft*, 58 F.3d at 1577. Beyond this, Anadarko attempts to build its argument atop

---

[4] Anadarko argues that the existence of the Future Torts Claim sub-trust, from which Ashworth may seek recovery, negates any due process considerations. (Dkt. No. 116 at 12–14.) Such sub-trust would allow Ashworth to seek recovery only if his claim arose pre-bankruptcy but was not discharged by the bankruptcy. (Dkt. No. 113-2 at § 1.2(b).) Since this Court ultimately finds Ashworth's claim to have arisen after bankruptcy, this argument is inapposite.

asbestos cases. (Dkt. No. 116 at 8–9 (citing cases).) To be sure, asbestos exposure is sufficient to establish a prepetition relationship in the Second Circuit. *See, e.g.*, *In re Johns-Manville Corp.*, 552 B.R. at 237. But asbestos appears to be a unique context: As one of the cases cited by Anadarko recognizes, some bankruptcy courts "have followed a form of the conduct test when considering the existence of an asbestos-related claim." *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (citations omitted). A rule in asbestos cases does not translate easily to the present situation.

In 2017, a Florida bankruptcy court dealt with an argument like the one Anadarko makes: that prepetition discharge of toxins was sufficient to satisfy the contact required by the prepetition relationship test. *U.S. Pipe & Foundry Co. v. Adams (In re U.S. Pipe & Foundry Co.)*, 577 B.R. 916, 922–23 (Bankr. M.D. Fla. 2017). The court rejected that argument, because neither claimants nor debtor had "any basis to suspect" that there were exposures from the debtor's prepetition conduct. *Id*. at 923–24. It distinguished its holding from asbestos cases in which claimants were *known* to have exposure, and thus had actual notice of the dangers of exposure before the bankruptcy. *Id*. It reasoned that the prepetition relationship test implicitly requires either that: (1) the debtor can identify, during the bankruptcy case, a class of potential future injury claimants or (2) future injury claimants have, during the case, knowledge of facts connecting them or their property to the debtor's conduct "so as to be aware of the potential impact of a bankruptcy discharge." *Id*. at 924. The court continued: "How can a "claim" be administered during a bankruptcy case if the alleged holder does not know enough to articulate it and the debtor does not know enough to be able to notify the future claimants or estimate their claims?" *Id*. at 925. It concluded that it "rejected the argument that Debtor's discharge of harmful chemicals into the air, water or soil since 1911, by itself, created the necessary

10

relationship of conduct to identifiable claimant, as required by the *Piper* test." *Id*.

Anadarko distinguishes *Pipe & Foundry Co.* as a decision that relied upon the notion that *no* party has "any basis to suspect" any exposure existed. *Id*. at 923. In contrast, Anadarko points out that the EPA declared the land where the creosoting operations were conducted a Super Fund site in 1991 (La. Compl. ¶ 28), and the site was listed on a schedule of environmental cleanup sites in bankruptcy documents (Dkt. No. 117-3 at 373[5]). These facts, Anadarko contends, set the present case apart from *Pipe & Foundry Co.*, apparently because Ashworth had a "basis to suspect" that his property may have faced contamination. 577 B.R. at 923.

Ultimately, though, this Court is not persuaded. "The [prepetition] relationship test asks whether the relationship was one in which both parties knew liability could arise . . . [such as a] relationship recognized in, for example, the law of contracts or torts." *Johns-Manville Corp.*, 422 B.R. at 233–34. Animating the prepetition relationship test, including the articulation set forth in *Motors Liquidation I*, is essentially a concern that it is unfair — and a potential denial of due process — to preclude a claimant from seeking redress due to no fault of her own. The EPA had a claim in *Chateaugay* based on its relationship to the polluter. 944 F.2d at 1005. The pre-bankruptcy purchasers in *Motors Liquidation I* had a claim based on their privity with the predecessor manufacturer. 829 F.3d at 157. Here, Anadarko and Ashworth had no prepetition contact or relationship in which "both parties knew liability could arise." *Johns-Manville Corp.*, 422 B.R. at 233. A Super Fund designation and a single-line listing in voluminous bankruptcy

---

[5] Due to numbering issues within the document, the Court uses the ECF-generated page numbers.

11

documents of a site over five miles from Ashworth's property is insufficient to establish such a relationship.

As the *Pipe & Foundry* court articulated, it is nonsensical to pretend that a claim was administered during a bankruptcy if neither claimant nor debtors knew anything about the claim. 577 B.R. at 925. Indeed, as this Court has previously held:

> The Court is certainly cognizant of the inherent uncertainty that allowing successor liability claims . . . imposes upon purchasers of debtor assets in a bankruptcy. However, to whatever extent maximizing the value of the estate is an important policy of the Bankruptcy Code, it is no more fundamental than giving claimants proper notice and opportunity to be heard before their rights are affected, to say nothing of constitutional requirements of due process.

*Grumman*, 467 B.R. at 710. That reasoning applies with equal force here.

Anadarko argues in its reply brief that the "detectable release [of creosote] *is* the requisite contact or relationship" satisfying the prepetition relationship test (Dkt. No. 116 at 1), noting that the complaint in the Louisiana litigation alleges that the pollution was causing damage to the plaintiffs' properties in the 1980s and 1990s, although Ashworth did not discover the pollution until 2019. The Court disagrees that the release itself, standing alone, constitutes the requisite "contact" or "relationship" under a fair reading of the Second Circuit's decisions in *Chateaugay* and *Motors Liquidation I*, particularly in light of the fairness and due process considerations discussed by the court in those decisions. Such a technical interpretation would extinguish claims based on no relationship to a potential tortfeasor beyond rough proximity — here, merely inhabiting land over five miles from the alleged tortfeasor's site.

Of course, should it come to light that Ashworth had more extensive contact or more of a relationship with Anadarko than presently known, such conclusion could be revisited. But on the facts alleged, Ashworth's claim did not arise before the bankruptcy. His claim was not a claim

that "could have been asserted" in the underlying litigation, and thus does not constitute a "Trust Derivative Claim."  (Agr. ¶ 1.82)

### 2. Whether Ashworth's Claims are Duplicative of Trust Derivative Claims

The Injunction also bars any claims that are "duplicative of a Trust Derivative Claim." The Second Circuit interpreted the Injunction's prohibition to mean that "claims can be duplicative '*whether or not* held or controlled by the Litigation Trust' and '*whether or not* the Litigation Trust could have asserted' them . . . [t]hese are, in other words, claims that substantially overlap, but are not identical to, 'Trust Derivative Claims.'"  *Tronox, Inc. v. Kerr-McGee Oil & Gas Corp. (In re Tronox Inc.)*, 855 F.3d 84, 108 (2d Cir. 2017) (quoting Inj.) (emphasis in original) (citation omitted).

Ashworth makes three arguments.  First, the fact that the Injunction prohibits duplicative claims cannot circumvent the *Motors Liquidation I* test.  For additional support, he cites Judge Forrest's order approving the Injunction, which notes that "[a]lthough the Injunction does bar potential claims by third parties, the Injunction is carefully limited so that it does not apply to any type of claim that could not have been litigated in" the underlying cases.  (Dkt. No. 32 at 21.)  Second, Ashworth suggests his claims do not "substantially overlap" with Trust Derivative Claims, since such claims exited pre-bankruptcy and Ashworth's do not, as this Court has determined.  *Tronox*, 855 F.3d at 108.  And finally, he points out that the Litigation Trust Agreement in the underlying cases granted the Litigation Trust only the authority to "sue on, settle or compromise . . . all claims, rights or causes of actions, suits and proceedings . . . that any Debtor or its Estate may hold against any person or entity . . ."  (Dkt. No. 104-19 § 2(b)(iii).) Thus, it could only grant a release from those claims, not claims such as Ashworth's.

Anadarko responds that Ashworth's theory of liability is "generalized" and "derivative," as he seeks to hold Anadarko liable under a successor theory that could be asserted by any creditor of the Tronox debtors against the debtors' successors. *See Tronox*, 855 F.3d at 104–07. Since the Injunction bars duplicative claims "whether or not the Litigation Trust could have asserted such claims," Ashworth's claims, arising in 2019, "substantially overlap[] with the generalized theory that underlies all Trust Derivative Claims." (Dkt. No. 116 at 11.)

But *Tronox* involved plaintiffs who brought prepetition claims against the debtor, actively participated in the bankruptcy, and recovered under the settlement, which they supported. 855 F.3d at 89–92. Animating the Second Circuit's holding was that, given the plaintiffs' involvement in the bankruptcy, they "[could not] now get a second bite at the apple." *Id*. at 111. The plaintiffs' knowledge was also "critical" to the court's reasoning in *In re General Motors LLC Ignition Switch Litigation*, 14 Misc. 2543, 2017 WL 3382071, at *5 (S.D.N.Y. Aug. 3, 2017). There, plaintiffs "did not know about their underlying claims prior to" bankruptcy, and so the court declined to read *Tronox* to preclude their claims. *Id*. at *4–6. Ultimately, the *Tronox* court never had the opportunity to further explain what it means for a claim to "substantially overlap" because it agreed with the district court's holding that the claims were Trust Derivative Claims, as they could have been brought in the underlying bankruptcy. 855 F.3d at 111.

At core, the Court's reasoning regarding whether Ashworth's claim constitutes a Trust Derivative Claim still holds. The *Motors Liquidation I* test holds that Ashworth had no pre-petition claim whatsoever, so it is difficult for this Court to see how Ashworth had a *duplicative* claim. Moreover, the due process considerations that counsel against an interpretation of the Injunction that would preclude Ashworth's Louisiana action counsel against finding a duplicative claim.

Ashworth's claims are neither Trust Derivative Claims nor duplicative of such claims. As such, the Injunction does not bar Ashworth's claims against Anadarko in the Western District of Louisiana.

### B. Contempt Motion

Anadarko also moves to hold Ashworth and his counsel in contempt for failing to dismiss the claims against Anadarko even after Anadarko's counsel "explained . . . why the Injunction bars his claims . . . , provid[ed] copies of the Injunction [and] decisions applying the Injunction, and even respond[ed] in writing to Ashworth's contentions for why the Injunction doesn't apply to him." (Dkt. No. 103 at 27.) Anadarko contends that Ashworth's case "clearly and willfully disobeys the Injunction," meriting holding him and his counsel in contempt and imposing sanctions. (*Id.*)

But as this Court has explained, Ashworth's counsel was correct. There is no behavior for which to hold Ashworth and his counsel in contempt, and the motion is denied.

## IV. Conclusion

For the foregoing reasons, Anadarko's motion to enforce the judgment and to hold Ashworth and his counsel in contempt is DENIED. The Clerk of Court is directed to close the motion at Docket Number 102.

SO ORDERED.

Dated: February 19, 2021
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

15